Volume 1 of 2

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN DOE, a minor, by his mother
and next friend, Jane Doe,

*Plaintiff-Appellant,*

and

JOSEPHINE HELELANI PAUAHI
RABAGO,

*Intervenor,*

v.

KAMEHAMEHA SCHOOLS/BERNICE
PAUAHI BISHOP ESTATE; CONSTANCE
H. LAU, NAINOA THOMPSON, DIANE
J. PLOTTS, ROBERT K.U. KIHUNE, J.
DOUGLAS ING, in their capacities as
Trustees of the Kamehameha
Schools/Bernice Pauahi Bishop
Estate,

*Defendants-Appellees.*

No. 04-15044

D.C. No.
CV-03-00316-ACK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Alan C. Kay, District Judge, Presiding

Argued and Submitted En Banc
June 20, 2006—San Francisco, California

Filed December 5, 2006

Before: Mary M. Schroeder, Chief Judge, and Harry Pregerson, Stephen Reinhardt, Alex Kozinski, Diarmuid F. O'Scannlain, Pamela Ann Rymer, Andrew J. Kleinfeld, Susan P. Graber, William A. Fletcher, Richard A. Paez, Marsha S. Berzon, Richard C. Tallman, Johnnie B. Rawlinson, Jay S. Bybee, and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Graber;
Concurrence by Judge W. Fletcher;
Dissent by Judge Bybee;
Dissent by Judge Rymer;
Dissent by Judge Kleinfeld;
Dissent by Judge Kozinski

## SUMMARY

### Constitutional Rights/Civil Rights

The court of appeals affirmed a judgment of the district court. The court held that under a modified Title VII analysis, to justify a remedial racial preference, (1) a private school must demonstrate that specific, significant imbalances in educational achievement presently affect the target population; (2) within the community as a whole, the admissions policy must not unnecessarily trammel the rights of students in the non-preferred class or create an absolute bar to their advancement; and (3) the admissions policy must do no more than is necessary to remedy the imbalance in the community as a whole.

Appellant John Doe, a student who had no Hawaiian ancestry, brought suit in district court against appellees including the Kamehameha Schools, arguing that he was denied admission into the Schools because of his race in violation of § 1981, which forbids racial discrimination in the making and

enforcement of contracts. The Kamehameha Schools, a Hawaiian private, non-profit K-12 school that received no federal funds, gave preference to students who were of native Hawaiian ancestry. The Schools' policy operated to admit students without any Hawaiian ancestry only after all qualified applicants with such ancestry have been admitted. But the admissions policy was not an absolute bar to non-Native Hawaiians; instead, it is intended to last only for so long as Native Hawaiians suffered educational disadvantages. The district court granted summary judgment to the Schools.

Doe appealed. A majority of a three-judge panel of the court of appeals held that the Schools' admissions policy constituted unlawful race discrimination under § 1981. The Ninth Circuit took this case en banc to reconsider.

[1] Section 1981 provides, in pertinent part, that all persons shall have the same right to make and enforce contracts as is enjoyed by white citizens. [2] The Supreme Court has decided that § 1981 prohibits discrimination against white people, as well as against non-whites. [3] The Court has not considered whether and under what terms (i.e., under what standard of scrutiny) a private remedial racial preference would be permissible in the educational context under § 1981. But in considering the reach of § 1981, the Supreme Court has looked, in different ways, to both the Fourteenth Amendment and Title VII for guidance. [4] Supreme Court precedent regarding § 1981 and Title VII suggests that the "strict scrutiny" standard of equal protection does not apply to a wholly private school's race-based remedial admissions plan. [5] It had to be concluded that Title VII principles applied here. Kamehameha Schools was a purely private entity that receives no federal funds. The Supreme Court has never applied strict scrutiny to the actions of a purely private entity. The question remained how best to adapt the Title VII employment framework to an educational context and to the unique historical circumstances of this case.

[6] In *Johnson v. Transp. Agency*, 480 U.S. 616 (1987), the Court concluded that a county-agency employer did not violate Title VII by taking into consideration the sex of a female employee in deciding to promote her instead of a male employee. [7] Under the Court's analysis in *Johnson*, private employers' affirmative action plans (1) must respond to a manifest imbalance in the work force; (2) must not unnecessarily trammel the rights of members of the non-preferred class or create an absolute bar to their advancement; and (3) must do no more than is necessary to attain a balance. It had to be held that the *Johnson* factors, modified to fit the context of this case, provided the appropriate framework for determining whether a wholly private K-12 educational institution's remedial admissions policy is valid.

[8] The court of appeals concluded that it should use a standard for evaluating remedial racial preferences by wholly private primary and secondary schools that is akin to that used in Title VII employment cases, but that takes into account the inherently broad and societal focus of the educational endeavor. [9] Adjusting the first *Johnson* factor to account for this external focus, it had to be held that, to justify a remedial racial preference, a private school must demonstrate that specific, significant imbalances in educational achievement presently affect the target population. [10] Modifying the second *Johnson* factor, within the community as a whole, an admissions policy must not unnecessarily trammel the rights of students in the non-preferred class or create an absolute bar to their advancement. The third *Johnson* factor was similarly modified; an admissions policy must do no more than is necessary to remedy the imbalance in the community as a whole, that we identified at the first step.

[11] Under the first modified *Johnson* factor, the question was whether a manifest imbalance in current educational achievement exists between Native Hawaiians and other ethnic groups in Hawaii. [12] The Kamehameha Schools showed that specific, significant imbalances in educational achieve-

ment affected Native Hawaiians in Hawaii and that the Schools aimed to remedy that imbalance. Accordingly, they satisfied the "manifest imbalance" criterion. [13] As to the second prong of the modified Title VII analysis, the well-documented ability of non-Native Hawaiians to attain educational achievement in Hawaii notwithstanding the Kamehameha Schools' longstanding admissions policy demonstrated that the policy neither unnecessarily trammeled the rights of non-Native Hawaiians nor absolutely barred their advancement in the relevant community. [14] Because the admissions policy was not fixed, but changed as the capacity of the Native Hawaiian community rose, the policy did no more than was necessary in light of the significant educational imbalances that Native Hawaiians continue to face. [15] Accordingly, the Kamehameha Schools' admissions policy satisfied the three modified *Johnson* criteria.

[16] Alternatively, the most plausible reading of § 1981—in light of the Hawkins-Stafford Amendments, which were in effect when Congress reenacted § 1981 in 1991, and the Native Hawaiian Education Act—was that Congress intended that a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy's ancestral lands, be upheld because it furthers the urgent need for better education of Native Hawaiians, which Congress has repeatedly identified as necessary. [17] Because the Schools were a wholly private K-12 educational establishment, whose preferential admissions policy was designed to counteract the significant, current educational deficits of Native Hawaiian children in Hawaii, and because in 1991 Congress clearly intended § 1981 to exist in harmony with its other legislation providing specially for the education of Native Hawaiians, it had to be concluded that the admissions policy was valid under § 1981. The judgment of the district court had to be affirmed.

Judge W. Fletcher concurred, writing separately because there was an easier and narrower ground for upholding Kame-

hameha Schools' admissions policy: "Native Hawaiian" is not merely a racial classification, it is also a political classification subject to the "special relationship doctrine," which permits Congress to provide special benefits to Native Americans.

Judge Bybee dissented, stating that Kamehameha Schools' admissions preference—a racially exclusive policy that operated as a complete bar to all applicants who are not of the preferred race—could not be reconciled with the Supreme Court's requirements for a valid affirmative action plan or the plain commands of § 1981, nor was there any evidence whatsoever that Congress exempted Kamehameha from § 1981 altogether.

Judge Ryner dissented, writing that reversal was required because, even if a private party should be able to assume a public responsibility for remediation of past societal discrimination, the acceptable goal of a race-conscious admissions policy for a public educational institution is to achieve a diverse student body; the purpose of Kamehameha Schools and its admissions policy was just the opposite.

Judge Kleinfeld dissented, declaring that the Civil Rights Act of 1866, § 1981, prohibits a private school from denying admission to prospective students because of their race; in Judge Kleinfeld's view, that was the end of the analysis.

Judge Kozinski dissented, writing to point out that the issue the court of appeals was called on to decide might be a problem of the Schools' own making: § 1981 was implicated because the Schools charged tuition and had to therefore enter into a contractual relationship with each student; were the schools to forgo charging tuition, their relationship to their students would probably not be deemed "contractual" as that term is used in § 1981.

## COUNSEL

Eric Grant, Sweeney, Davidian, Greene & Grant LLP, Sacramento, California, for the plaintiff-appellant.

Kathleen M. Sullivan, Stanford, California; David Schulmeister, Cades Schutte LLP, Honolulu, Hawaii, for the defendants-appellees.

Patrick M.K. Richardson, McCracken, Byers & Haesloop LLP, San Mateo, California; Mark J. Bennett, Attorney General of the State of Hawaii, Honolulu, Hawaii; Alexander E. Dreier, Hogan & Hartson LLP, Washington, D.C.; Jeffrey N. Watanabe, Honolulu, Hawaii; David M. Forman, Honolulu, Hawaii; Wayne M. Pitluck, Pitluck, Kido, Stone & Aipa LLP, Honolulu, Hawaii; Richard A. Guest, Native American Rights Fund, Washington, D.C., and Carol H. Daniel, Alaskan Federation of Natives, Anchorage, Alaska; Carrie K.S. Okinaga, Corporation Counsel for the City and County of Honolulu, Honolulu, Hawaii; Moses K.N. Haia III, Native Hawaiian Legal Corporation, Honolulu, Hawaii; Clayton A. Kamida, Torkildson, Katz, Fonseca, Moore & Hetherington, Honolulu, Hawaii; John Ishihara, Hawaii Civil Rights Commission, Honolulu, Hawaii; Eric K. Yamamoto, Honolulu, Hawaii, for amici curiae.

## OPINION

GRABER, Circuit Judge:

Plaintiff John Doe, a student who has no Hawaiian ancestry, applied for admission to Defendant Kamehameha Schools, a private, non-profit K-12 educational institution in Hawaii that receives no federal funds. He was denied entry. The Kamehameha Schools were created through a charitable testamentary trust, established by the last direct descendant of

the Hawaiian monarchy, for the education and upbringing of Native Hawaiians. As a result, the Kamehameha Schools' admissions policy gives preference to students of Hawaiian ancestry. Plaintiff argues that he was denied admission because of his race in violation of 42 U.S.C. § 1981.

The majority of a three-judge panel held that the Kamehameha Schools' admissions policy, with its preference for Native Hawaiians, constituted unlawful race discrimination under 42 U.S.C. § 1981.[1] We took this case en banc to reconsider whether a Hawaiian private, non-profit K-12 school that receives no federal funds violates § 1981 by preferring Native Hawaiians in its admissions policy. We now answer "no" to that question and, accordingly, affirm the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

#### 1. Historical Context[2]

The islands of Hawaii are geographically isolated in the South Pacific Ocean and were originally settled sometime between 1 and 750 A.D. The Native Hawaiians developed a well-organized, efficient, and thriving civilization "based on a communal land tenure system with a sophisticated language, culture, and religion." 20 U.S.C. § 7512. The land, abundant in natural resources, allowed the Native Hawaiians to thrive. Office of Hawaiian Affairs, Native Hawaiian Rights Handbook 3 (Melody Kapilialoha MacKenzie ed. 1991) (hereinafter "Rights Handbook").

[1] Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate, 416 F.3d 1025 (9th Cir. 2005), reh'g en banc granted, 441 F.3d 1029 (9th Cir. 2006).

[2] This general information simply sets the stage for our more particular consideration of the educational status of Native Hawaiian children.

The first Western contact with the Hawaiian islands occurred in 1778 when Captain James Cook landed on the island of Kauai. The immediate result of that first encounter was that Native Hawaiians were introduced to Western goods and Western diseases. "By 1919, the Native Hawaiian population had declined from an estimated 1,000,000 in 1778 to an alarming 22,600." 20 U.S.C. § 7512(7). But see Rice v. Cayetano, 528 U.S. 495, 500 (2000) (estimating the population in 1778 as between 200,000 and 300,000).

In 1810, Kamehameha I created a unified monarchy over all the Hawaiian Islands, becoming the first King of Hawaii and affording the islands a level of cohesion and security that they had not previously known. The United States officially recognized the sovereignty of the Kingdom of Hawaii in 1826 and, from 1843 until 1893, extended full diplomatic recognition to the islands. Other countries, too—including Great Britain, France, and Japan—recognized the Hawaiian Kingdom. 20 U.S.C. § 7512(1). Before 1893, the United States entered into a number of treaties for peace, friendship, and commerce with the Kingdom. U.S. Dep't of Justice & U.S. Dep't of the Interior, From Mauka to Makai: The River of Justice Must Flow Freely 1 (Oct. 23, 2000) (hereinafter "From Mauka to Makai"). The first treaty was signed in 1826, and additional treaties were signed in 1849, 1875, and 1887. See Rice, 528 U.S. at 504 (discussing the history of diplomatic relations between the United States and the Kingdom of Hawaii before the overthrow of the monarchy).

The Kingdom of Hawaii, located along shipping and fishing routes, was commercially desirable. Initially, trade with the Kingdom of Hawaii revolved around the islands' fur and sandalwood resources, as well as the whaling industry. Rights Handbook at 5. When over-harvesting destroyed the "sandalwood trade and depleted the whaling stocks, wealthy Westerners turned to large-scale plantations, primarily growing sugar, to make money. Id. As foreign investment became more and more tied to land ownership, demand for change in

the traditional land tenure system, which did not provide for individual land titles, intensified. *Id.* at 6. Pressure from Westerners eventually led the Hawaiian government to reject the land tenure system in favor of privatized land ownership, which allowed Westerners "[w]ith a permanent population of fewer than two thousand" to take "over most of Hawaii's land in the next half-century and manipulate[] the economy for their own profit." Neil M. Levy, *Native Hawaiian Land Rights*, 63 Cal. L. Rev. 848, 857-58 (1975) (footnote omitted).

Western economic domination of the Hawaiian Islands was followed by an interest in establishing political control. *Id.* at 861. "In 1893, the sovereign, independent, internationally recognized, and indigenous government of Hawaii, the Kingdom of Hawaii, was overthrown by a small group of non-Hawaiians, including United States citizens, who were assisted in their efforts by the United States Minister, a United States naval representative, and armed naval forces of the United States." 20 U.S.C. § 7512(5). The United States annexed Hawaii not long thereafter. *Id.* § 7512(6). Laws were then enacted suppressing the Hawaiian culture and language and allowing for the displacement of Native Hawaiians from their lands. From 1896 to 1986, almost a full century, the Hawaiian language was banned as a medium of instruction in schools. *Id.* § 7512(19). Hula, a Native Hawaiian dance form, and local healing practices also had been banned during the westernization of the islands. Such measures resulted in "mortality, disease, economic deprivation, social distress and population decline." *From Mauka to Makai* at 1.

Hawaii finally attained statehood in 1959. *Rights Handbook* at 18. More than 30 years later, in recognition of the United States' role in the overthrow of the independent Hawaiian monarchy, Congress officially apologized to the Hawaiian people and expressed its commitment to "provide a proper foundation for reconciliation between the United States and the Native Hawaiian people." 1993 Apology Resolution, Pub. L. No. 103-150, 107 Stat. 1510, 1513 (1993).

### 2. The Kamehameha Schools

The Kamehameha Schools were created under a "charitable testamentary trust established by the last direct descendent of King Kamehameha I, Princess Bernice Pauahi Bishop, who left her property in trust for a school dedicated to the education and upbringing of Native Hawaiians." *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). Princess Bernice Pauahi Bishop's will provided for the erection and maintenance of schools in the Hawaiian Islands, called the Kamehameha Schools, on the Hawaiian monarchy's ancestral lands, with the purpose of providing "a good education in the common English branches, and also instruction in morals and in such useful knowledge as may tend to make good and industrious men and women." Will of Bernice Pauahi Bishop, *reprinted in Wills and Deeds of Trust* 17-18 (3d ed. 1957) (hereinafter "Pauahi Bishop Will"). The Pauahi Bishop Will also bestowed on the "trustees full power to make all such rules and regulations as they may deem necessary for the government of said schools and to regulate the admission of pupils." *Id.* at 18.

Under the direction of the original trustees, chaired by Pauahi Bishop's widower, Charles Reed Bishop, the Kamehameha Schools opened in the late nineteenth century.[3] During a speech on the Schools' first Founder's Day, in December 1888, Charles Reed Bishop stated that Princess Bernice Pauahi Bishop had created the Kamehameha Schools, "in which Hawaiians have the preference," so that "her own people" could once again thrive. Charles R. Bishop, *The Purpose of the Schools*, Handicraft, Jan. 1889, at 3.

In 1910, not long after the death of Princess Bernice Pauahi

[3] The Pauahi Bishop Will established two separate schools, one for boys and one for girls. The boys' school opened in 1887 and the girls' school in 1894. During the 1965-1966 school year, the two schools were consolidated.

Bishop and the creation of the Kamehameha Schools, the question arose as to who should be admitted to the Schools. Cobey Black & Kathleen Mellen, *Princess Pauahi Bishop and Her Legacy* 155 (The Kamehameha Schools Press 1965). Charles Bishop wrote to the trustees: "Mrs. Bishop intended that, in the advantages of her beneficence, those of her race should have preference." *Id.* Accordingly, he concluded that the principal of the Schools was justified in refusing to admit a student who had no native Hawaiian ancestry. *Id.* Bishop went on to convey that only if Native Hawaiians failed to apply to the Schools, or if conditions changed fundamentally, should admissions be opened to other ethnicities: "It was wise to prepare for and to admit natives only and I do not think the time has come to depart from that rule." *Id.*

Today, the Kamehameha Schools operate three K-12 campuses: Kapalama on the island of Oahu, Pukalani on the island of Maui, and Keaau on the island of Hawaii. There are about 70,000 school-aged children in Hawaii who meet the Schools' definition of Native Hawaiian, but the Schools' total enrollment is only about 4,856 students. The Kamehameha Schools subsidize much of the tuition cost for all students, requiring payment of only $1,784 per year, whereas the cost of educating a student amounts to about $20,000 annually. Sixty-five percent of those enrolled receive some form of financial aid to help them pay even that heavily subsidized, modest tuition.

Part of the Kamehameha Schools' stated admissions policy is to give preference to students of Native Hawaiian ancestry, defined to include any person descended from the aboriginal people who exercised sovereignty in the Hawaiian Islands prior to 1778. Practically, the policy operates to admit students without any Hawaiian ancestry only after all qualified applicants with such ancestry have been admitted. Because there are many more qualified students of Hawaiian ancestry than there are available places at the Schools, it is very rare that a student with no Hawaiian ancestry is admitted to the

campus programs. But the admissions policy is not an absolute bar to non-Native Hawaiians; instead, it is intended to last only for so long as Native Hawaiians suffer educational disadvantages.

We pause to note that the Schools' policy contains no requirement for a minimum blood quantum of Hawaiian ancestry. The only requirement is that a student have at least one Native Hawaiian ancestor. Most students have mixed ancestry. More than 60 different racial and ethnic groups have been represented in the student body, and for the 2000-2001 academic year, students reported belonging to 39 different racial and ethnic groups. Accordingly, an observer visiting the Schools would see visible diversity notwithstanding the students' commonality of having at least one Native Hawaiian ancestor.

The Kamehameha Schools follow a "Leadership Model" of education. This curriculum is meant to foster the self-esteem and self-identity of students as individuals of Native Hawaiian descent by teaching Native Hawaiian culture, heritage, language, and tradition, in addition to general college-preparatory courses.

Kamehameha Schools also operate a number of other educational programs, including pre-schools, enrichment programs, and summer school programs. In those programs, the admission of non-Native Hawaiians occurs more often. For example, for the 2001-2002 school year, 13 children with no Native Hawaiian ancestry were admitted to Kamehameha's pre-school program (two of the children declined admission); the following school year 12 non-Native Hawaiian children were admitted to the pre-school; and the year after that—the 2003-2004 school year—16 students without Native Hawaiian ancestry were admitted. And, in the summer of 2003, for instance, non-Native Hawaiians were enrolled in several of the enrichment programs run by the Kamehameha Schools: 6 of 133 students in the Performing Arts Academy; 33 of 1,741

students in Explorations; 5 of 18 students in Culinary Arts; and 4 of 164 students in Hoolauna Keauhou.

### 3. Current Conditions in the Educational Status of Native Hawaiians

Although the Kamehameha Schools are partly responsible for the Native Hawaiian community's ability to maintain "its distinct character as an aboriginal, native people," Native Hawaiians, nonetheless, continue to face "economic deprivation, low educational attainment, poor health status, substandard housing and social dislocation." *From Mauka to Makai* at 2. In particular, Native Hawaiians have traditionally performed much below national averages in the educational arena.

In 1981, Congress instructed the Office of Education to submit to Congress a comprehensive report on Native Hawaiian education. The report, entitled the "Native Hawaiian Educational Assessment Project," was released in 1983 and documented that Native Hawaiians scored below parity with regard to national norms on standardized achievement tests, were disproportionately represented in many negative social and physical statistics indicative of special educational needs, and had educational needs that were related to their unique cultural situation, such as different learning styles and low self-image.

20 U.S.C. § 7512(4).

That trend continues today. In 2002, Congress recognized that Native Hawaiians are severely disadvantaged in education. It found that:

(A) educational risk factors continue to start even before birth from many Native Hawaiian children[;]
. . .

(B) Native Hawaiian students continue to begin their school experience lagging behind other students in terms of readiness factors such as vocabulary test scores;

(C) Native Hawaiian students continue to score below national norms on standardized education achievement tests at all grade levels;

(D) both public and private schools continue to show a pattern of lower percentages of Native Hawaiian students in the uppermost achievement levels and in gifted and talented programs;

(E) Native Hawaiian students continue to be overrepresented among students qualifying for special education programs provided to students with learning disabilities, mild mental retardation, emotional impairment, and other such disabilities;

(F) Native Hawaiians continue to be underrepresented in institutions of higher education and among adults who have completed four or more years of college;

(G) Native Hawaiians continue to be disproportionately represented in many negative social and physical statistics indicative of special educational needs[;] . . .

. . . and

(H) Native Hawaiians now comprise over 23 percent of the students served by the State of Hawaii Department of Education, and there are and will continue to be geographically rural, isolated areas with a high Native Hawaiian population density.

20 U.S.C. § 7512(6)(A)–(H).

In addition, the most recent Native Hawaiian Educational Assessment, published in September 2005, concluded that, "[o]n the whole, . . . Native Hawaiian children in the public school system perform poorly in school compared with their non-Hawaiian peers." Ka Huakai, *2005 Native Hawaiian Educational Assessment* 229, *available at* http://uliokau.org/elib/cgi-bin/library?e=mheak1=en (hereinafter "Ka Huakai"). That most recent report found that 75% of public schools with a predominantly Native Hawaiian student body did not meet the state's adequate yearly progress standards, but that number dropped to less than 58% for schools without a majority of Native Hawaiians, a difference of more than 17%. *Id.* at 251. Also, Native Hawaiian students in elementary and secondary public schools ranked the lowest of all major ethnic groups throughout the state in reading and math, falling between 9 and 15 percentiles behind the state average. *Id.* at 261, 268. In addition, only 69.4% of Native Hawaiian students graduated from high school in 2002, compared to a state average of 76.6% overall. *Id.* at 285.[4]

### B. *Procedural History*

Plaintiff applied for admission to the Kamehameha Schools. He has no Hawaiian ancestry. Although the school

---

[4]Disparities abound outside of the educational context as well. Today among the major ethnic groups in Hawaii, Native Hawaiians face the highest rates of unemployment, Ka Huakai at 84, and poverty, *id.* at 86-87, and the lowest mean family income, *id.* at 85-86. They live in the poorest geographic areas and are underrepresented in managerial and professional occupations, *id.* at 8. Native Hawaiians suffer from greater heath risks than other ethnic groups on the islands, with the lowest life expectancy and highest mortality rates from cancer, heart disease, and diabetes. *Id.* at 93. Although Native Hawaiians account for approximately 20% of the state's population, they account for more than half of all teenage pregnancies, *id.* at 205, and more than 44% of child abuse and neglect cases in the state. *Id.* at 206. Native Hawaiians are more likely to be arrested for violent crimes than any other ethnic group in the state. *Id.* at 76-77.

---

deemed him a "competitive applicant" and put him on the waiting list, he was repeatedly denied admission. The Kamehameha Schools concede that Plaintiff likely would have been admitted had he possessed Hawaiian ancestry.

Plaintiff filed an action under 42 U.S.C. § 1981, challenging the Kamehameha Schools' admissions policy. He sought both damages and injunctive relief.[5] The district court granted summary judgment in favor of the Kamehameha Schools, holding that the policy satisfied a variation of the standard used to evaluate affirmative action plans challenged under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000h-6:

> The Court finds the plan has a legitimate justification and serves a legitimate remedial purpose by addressing the socioeconomic and educational disadvantages facing Native Hawaiians, producing Native Hawaiian leadership for community involvement, and revitalizing Native Hawaiian culture, thereby remedying current manifest imbalances resulting from the influx of western civilization.

*Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate,* 295 F. Supp. 2d 1141, 1172 (D. Haw. 2003). The district court also held that application of § 1981 to the admissions policy should be consistent with other congressional enactments involving Native Hawaiians. *Id.* at 1174. Plaintiff timely appealed.

The majority of a three judge panel reversed the district court. *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate,* 416 F.3d 1025, 1048 (9th Cir. 2005). The panel con-

---

[5]Plaintiff now seeks only damages because he is no longer a high school student. This case is not moot, however, because if the Kamehameha Schools' admissions policy were unlawful, Plaintiff has a possible claim for money damages.

19064    DOE v. KAMEHAMEHA SCHOOLS

cluded that the Title VII framework applied, *id.* at 1038-39, but the majority held that the Kamehameha Schools' preference policy violated § 1981 because it "operates as an absolute bar to admission for non-Hawaiians," *id.* at 1041. We then took the case en banc.[8] *Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, 441 F.3d 1029 (9th Cir. 2006).

## STANDARD OF REVIEW

The parties, and we, agree that we review de novo a grant of summary judgment. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). But the parties dispute vigorously what standard we should use to analyze the validity of the Kamehameha Schools' admission policy.

Plaintiff argues that the Schools' policy should be evalu-

[8] The panel's decision generated strong public opposition. Eleven amicus briefs were filed by diverse political and social interests in Hawaii supporting rehearing en banc. These amicus briefs were filed by: (1) the State of Hawaii; (2) the entire Hawaiian congressional delegation; (3) the Mayor of the City and County of Honolulu, and the City and County of Honolulu; (4) the Hawaii Business Roundtable, the Hawaii Korean Chamber of Commerce, the Public Schools of Hawaii Foundation, and the Hawaii Association of Independent Schools; (5) the National Association of Independent Schools; (6) the Parent-Teacher Association of Kamehameha Schools, and the Alumni Association of Kamehameha Schools; (7) the Native Hawaiian Legal Corporation, the Native Hawaiian Bar Association, and Nā ʻŌiwi o Hawaiʻi; (8) various Hawaiian service organizations; (9) ʻIhoʻulakalani Coalition, an organization of Hawaiian master teachers and cultural experts, (10) the Japanese American Citizens League of Hawaii-Honolulu Chapter and other civic groups; and (11) the National Indian Education Association and the Alaskan Federation of Natives. Additionally, the current governor of Hawaii and a prominent former governor both submitted declarations to the district court on the importance of maintaining the Kamehameha Schools' admissions policy. *Doe*, 295 F. Supp. 2d at 1169, 1171; *see also* Recent Cases, *Civil Rights—Section 1981—Ninth Circuit Holds that Private School's Remedial Admissions Policy Violates § 1981—Doe v. Kamehameha Schools, 4th F.3d 1025 (9th Cir. 2005)*, 119 Harv. L. Rev. 661, 668 (2005) (concluding that a traditional Title VII approach is not appropriate in the private school context).

DOE v. KAMEHAMEHA SCHOOLS    19065

ated under the "strict scrutiny" standard that applies to governmental action involving race-based preferences. The Schools counter that we should employ the more deferential Title VII test for evaluating affirmative action plans, with variations appropriate to the educational context. For the reasons that we detail below, we agree with the Schools.

## DISCUSSION

### A.  History of § 1981, Runyon, and McDonald

[1] Title 42 U.S.C. § 1981 provides, in pertinent part, that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." The genesis of the current statute was the Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (hereinafter "1866 Act"), which Congress enacted pursuant to the Thirteenth Amendment.[9] Under its authority to enact laws to abolish the "badges and incidents of slavery," *United States v. Stanley (Civil Rights Cases)*, 109 U.S. 3, 20 (1883), Congress intended for the 1866 Act to counter the explicit discrimination faced by the recently freed slaves. *See Gen. Bldg. Contractors Ass'n v.*

[9] Section 1 of the Civil Rights Act of 1866 provided:
That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

14 Stat. at 27

19066     DOE v. KAMEHAMEHA SCHOOLS

*Pennsylvania*, 458 U.S. 375, 386-88 (1982) ("Congress instead acted to protect the freedmen from intentional discrimination by those whose object was to make their former slaves dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices." (internal quotation marks omitted)).

After the passage of the Fourteenth Amendment, Congress reenacted, with minor changes, the text of the 1866 Act in section 16 of the Enforcement Act of 1870, ch. 114, § 16, 16 Stat. 140 (hereinafter "1870 Act").[8] *See Runyon v. McCrary*, 427 U.S. 160, 169 n.8 (1976) (describing the history of § 1981 and noting that section 16 of the 1870 Act was "merely a re-enactment," with some small changes, of the 1866 Act). Accordingly, § 1981 has "roots" in both the Thirteenth and the Fourteenth Amendments. *Gen. Bldg. Contractors*, 458 U.S. at 390 n.17. But the "events and passions of the time in which the law was forged" make clear that the purpose of § 1981 was to destroy the societal influences that were intended to keep former slaves from achieving parity with former masters. *Id.* at 386 (internal quotation marks omitted).

Section 1981 largely lay dormant for nearly a century when, in 1976, the Supreme Court reinvigorated the statute in *Runyon*. In *Runyon*, the Supreme Court faced the question

[8]In pertinent part, section 16 of the Enforcement Act of 1870 provides:

And it be further enacted, That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding.

16 Stat. at 144.

DOE v. KAMEHAMEHA SCHOOLS     19067

whether § 1981 prevents "private, commercially operated, nonsectarian schools from denying admission to prospective students because they are Negroes," 427 U.S. at 168, and held that it does, *id.* at 172-73.[9] The parents of African-American children had sought to enter into contractual relationships with the schools. "Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments." *Id.* at 172. The schools' refusal to admit them therefore "amount[ed] to a classic violation of § 1981." *Id.* The Court noted that Congress had the right to reach private acts of discrimination in the private school setting because of its power under the Thirteenth Amendment to enact legislation to combat racial discrimination. *Id.* at 170-71. *Runyon*, then, involved a straightforward case of discrimination, not a remedial policy.

[2] On the same day as it issued *Runyon*, the Court decided that § 1981, notwithstanding its text, prohibits discrimination against white people, as well as against non-whites. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 296 (1976).

[3] In neither case did the Court have occasion to consider whether and under what terms (i.e., under what standard of scrutiny) a private remedial racial preference would be permissible in the educational context under § 1981, nor has it since. But in considering the reach of § 1981, the Supreme

[9]The Kamehameha Schools are non-profit, rather than commercial. But, because the schools charge tuition (albeit at a rate that represents only a fraction of the cost to educate students), the bargained-for exchange of payments for instruction exists here, as it did in *Runyon*. We need not and do not decide whether § 1981 would apply if the Schools charged no tuition at all, but simply donated education to Native Hawaiian students.

In addition, for the purposes of our decision, we accept that "Native Hawaiian"—like "Negro"—is a racial classification. *See Rice v. Cayetano*, 528 U.S. 495, 514 (2000) (so holding in the context of a voting rights case).

Court has looked, in different ways, to both the Fourteenth Amendment and Title VII for guidance.

## B. Application of Title VII Standards to § 1981 Claims

[4] In *General Building Contractors*, the Court limited § 1981 to cover only acts involving intentional discrimination, excluding from the statue's reach actions that merely have a disparate effect. 458 U.S. at 391. In so doing, the Court relied on the fact that § 1981 traces its history, in part, to the Fourteenth Amendment and, accordingly, to the Equal Protection Clause. *Id.* at 390-91. Even though the Supreme Court imported the purposeful discrimination element of its equal protection jurisprudence to § 1981, later Supreme Court precedent regarding § 1981 and Title VII suggests that the "strict scrutiny" standard of equal protection does not apply to a wholly private school's race-based remedial admissions plan.

In *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989), *superseded by statute on other grounds as stated in Estate of Reynolds v. Martin*, 985 F.2d 470, 475 n.2 (9th Cir. 1993), the Supreme Court signaled its intention to apply the Title VII analysis to § 1981 claims brought against a private employer. In *Patterson*, the plaintiff brought a § 1981 suit against her former employer, alleging that the employer had harassed her, failed to promote her, and fired her on account of her race. 491 U.S. at 169. The Court analyzed the ways in which § 1981 and Title VII overlap, as well as the statutes' differences, and concluded that the Title VII burden-shifting system of proof established in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), applied to the case at hand. *Patterson*, 491 U.S. at 186. That is, the plaintiff first must establish a prima facie case of discrimination by coming forward with evidence that an employer considered race in its employment decisions. *Id.*; *Johnson v. Transp. Agency*, 480 U.S. 616, 626 (1987). After a prima facie case is established, the burden shifts to the

employer to provide a legitimate, non-discriminatory reason for the decision. *Patterson*, 491 U.S. at 187. "The existence of an affirmative action plan provides such a rationale." *Johnson*, 480 U.S. at 626. If a relevant affirmative action plan exists, then the burden shifts back to the plaintiff to show that the justification provided was pretextual and that the plan is invalid. *Id.*

Several courts expressly have applied Title VII's substantive standards when examining § 1981 challenges to private affirmative action plans. The leading case, on which all the others rely, is *Setser v. Novack Investment Co.*, 657 F.2d 962 (8th Cir. 1981) (en banc). In *Setser*, the plaintiff, a white man, sued Novack under § 1981 claiming that he had been refused employment on account of his race because of an affirmative action plan. *Setser v. Novack Inv. Co.*, 638 F.2d 1137, 1139 & n.3 (8th Cir. 1981), *opinion vacated in part on reh'g by Setser*, 657 F.2d at 962. The *Setser* court addressed two issues that are relevant here: "(1) whether section 1981 prohibits all race-conscious affirmative action; [and] (2) whether the standards for reviewing affirmative action under [T]itle VII govern the review of such plans under section 1981." 657 F.2d at 965.

The Eighth Circuit first concluded that § 1981 does not bar affirmative action programs, even in light of *McDonald*, 427 U.S. at 296, which held that § 1981 affords protection to white people. In so holding, the *Setser* court looked to the Supreme Court's decision in *United Steelworkers of Am. v. Weber*, 443 U.S. 193 (1979), which held that Title VII does not bar all preferential treatment on the basis of race, and applied the same rationale to § 1981:

> It would indeed be . . . ironic if the Civil Rights Act of 1866 was used now to prohibit the only effective remedy for past discriminatory employment practices against blacks and other minorities, when the Act was virtually useless to prevent the occurrence

of such discrimination for more than a century . . . . *We conclude that the Supreme Court, by approving race-conscious affirmative action by employers in Weber, implicitly approved the use of race-conscious plans to remedy past discrimination under section 1981.* To open the door for such plans under [Title VII and close it under section 1981 would make little sense. The prohibition under section 1981 of affirmative action plans permissible under [Title VII would bar a remedy Congress left within the discretion of private employers when it passed [Title VII.

*Setser*, 657 F.2d at 966-67 (emphasis added).

Having determined that affirmative action plans were permissible, the *Setser* court expressly "equate[d] the affirmative action standards of [Title VII with those of section 1981." *Id.* at 967. The court did so in view of the general principle that, "[i]n fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to ethe principles of law created under [Title VII for direction." *Id.* (internal quotation marks omitted). This principle of consistency was especially important to the *Setser* court because it found untenable the prospect that an employer could be ordered, under Title VII, to implement an affirmative action plan, but simultaneously barred from implementing that same plan under § 1981, if the two statutes were interpreted differently. *Id.* at 967-68.

The Third Circuit in a recent decision, as well as other courts, have followed *Setser* in using Title VII standards to evaluate private affirmative action plans challenged under § 1981. *See, e.g., Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498-99 (3d Cir. 1999); *Edmonson v. U.S. Steel Corp.*, 659 F.2d 582, 584 (5th Cir. 1981) (per curiam); *Frost v. Chrysler Motor Corp.*, 826 F. Supp. 1290, 1294 (W.D. Okla. 1993); *Stock v. Universal Foods Corp.*, 817 F. Supp. 1300, 1306 (D. Md. 1993); *see also Johnson v. Transp. Agency*, 770

F.2d 752, 755 n.2 (9th Cir. 1985) (noting, with approval, the *Setser* analysis), *aff'd*, 480 U.S. 616 (1987).

The Supreme Court's recent University of Michigan cases —*Grutter v. Bollinger*, 539 U.S. 306 (2003), and *Gratz v. Bollinger*, 539 U.S. 244 (2003)—do not counsel a different result. In those cases, the Supreme Court strictly scrutinized the admissions policies of a *public university*, the University of Michigan Law School and its undergraduate counterpart. *See Grutter*, 539 U.S. at 326 (law school); *Gratz*, 539 U.S. at 270 (undergraduate institution). Plaintiff places great stock in the fact that in both cases, the Supreme Court mentioned § 1981 in conjunction with the plaintiff's Equal Protection Clause claim. *See Grutter*, 539 U.S. at 343 (noting that, because the law school's admissions policy satisfied strict scrutiny review under the Equal Protection Clause, it also satisfied § 1981); *Gratz*, 539 U.S. at 275-76 n.23 (noting that, because the university's undergraduate admissions program failed strict scrutiny under the Equal Protection Clause, it also violated § 1981).

To support both of its holdings, the Court cited *General Building Contractors* for the proposition that discrimination that violates the Equal Protection Clause also violates § 1981. *See Grutter*, 539 U.S. at 343 (noting that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause"); *Gratz*, 539 U.S. at 276 n.23 ("[P]urposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981."). As explained earlier, in *General Building Contractors*, the Court held that § 1981, like the Equal Protection Clause, prohibits only purposeful discrimination and therefore does not permit claims of disparate impact. 458 U.S. at 389. Read in context, we believe that the Supreme Court's citation to *General Building Contractors* in the University of Michigan cases was meant to signal only the fact that both § 1981 and the Fourteenth Amendment require intentional discrimination. Whether strict scrutiny applies to § 1981 claims was

not at issue. In *Grutter* and *Gratz*, cases involving state action, the schools perforce did not argue that their programs satisfied § 1981. The Court in *Grutter* and *Gratz* simply did not consider the question.

[5] In view of the precedents that we have just discussed, we conclude that Title VII principles apply here. Defendant is a purely private entity that receives no federal funds. The Supreme Court has never applied strict scrutiny to the actions of a purely private entity. The question remains how best to adapt the Title VII employment framework to an educational context and to the unique historical circumstances of this case.

C. *Applying a Modified Title VII Standard in the Educational Context Under § 1981*

Only step three of the traditional three-stage Title VII analysis, *Patterson*, 491 U.S. at 187; *Johnson*, 480 U.S. at 626, is at issue here. At step one, Plaintiff established a prima facie case by showing (as the Schools concede) that the Kamehameha Schools consider applicants' Hawaiian ancestry, or lack thereof, in making admissions decisions. At step two, the Kamehameha Schools have specified their remedial admissions policy as the non-discriminatory rationale for their decisions. *See Johnson*, 480 U.S. at 626 (holding that an affirmative action plan provides a legitimate reason for a hiring decision that considers race or ethnicity). The validity of this policy is the focus of the parties' attentions in this case. That is, at step three, Plaintiff asserts that the Schools' "justification is pretextual and the [admissions] plan is invalid." *Id.* The burden of proof is at this step lies with Plaintiff. *Id.* at 627.

The Supreme Court has outlined the appropriate step-three Title VII inquiry in the context of private employment. In *Weber*, the Court held for the first time that Title VII does not prevent private employers from implementing voluntary, remedial affirmative action plans. 443 U.S. at 208. *Weber* involved an employer that had established a training program

and reserved 50% of the program's openings for black employees until the percentage of black workers in its plant reached the percentage of black workers in the local labor force. *Id.* at 197. In concluding that the plan was permissible under Title VII, the Court noted that the plan did not "unnecessarily trammel the interests of the white employees," or "create an absolute bar to the[ir] advancement." *Id.* at 208. The Court based its decision in part on the fact that the plan was a "temporary measure": "Preferential selection . . . will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximates the percentage of blacks in the local labor force." *Id.* at 208-09. The Court declined to "define in detail the line of demarcation between permissible and impermissible affirmative action plans." *Id.* at 208; *see also Johnson*, 770 F.2d at 757 (noting that the Supreme Court had not "establish[ed] a rigid formula for testing the validity of an affirmative action plan"), *aff'd*, 480 U.S. at 641.

[6] Eight years later, in *Johnson*, the Court concluded that a county-agency employer did not violate Title VII by taking into consideration the sex of a female employee in deciding to promote her instead of a male employee. The promotional policy, which took into consideration the sex and race of an applicant, was valid because it attempted to eliminate a "manifest imbalance" in a "traditionally segregated job categor[y]." *Johnson*, 480 U.S. at 631 (internal quotation marks omitted). Like *Weber*, *Johnson* also considered whether the plan unnecessarily trammeled the rights of the non-preferred class, in this case men, or created an absolute bar to their advancement. *Id.* at 637-38. Finally, the Court considered whether the plan was "temporary," designed to "attain a balanced work force, not to maintain one." *Id.* at 639-40.

[7] We recently distilled the Court's analysis this way: private employers' affirmative action plans (1) must respond to a manifest imbalance in the work force; (2) must not "unnecessarily trammel[]" the rights of members of the non-preferred class or "create an absolute bar to their advance-

ment"; and (3) must do no more than is necessary to attain a balance. *Rudebusch v. Hughes*, 313 F.3d 506, 520-21 (9th Cir. 2002). In *Rudebusch*, we found that the pay equity plan at issue was "not wholly analogous" to the hiring and promotional plans at issue in *Weber* and *Johnson* because of "some significant conceptual differences" between the types of plans. *Id.* at 520. We nevertheless applied the three *Johnson* factors, taking account of "the context of our case." *Id.* at 521. Similarly, we hold today that the *Johnson* factors, modified to fit "the context of our case," provide the appropriate framework for determining whether a wholly private K-12 educational institution's remedial admissions policy is valid.

We note that, when assessing the validity of affirmative action plans, the Supreme Court has consistently recognized the importance of deferring to the judgment and expertise of the relevant decisionmakers. *See Grutter*, 539 U.S. at 328 (deferring to education officials in admissions decisions); *Weber*, 443 U.S. at 206 (giving deference to employers in hiring decisions). In the employment context, the Supreme Court held that, in enacting Title VII, Congress wished to preserve, to the maximum extent possible, the freedom and discretion traditionally afforded to private businesses. *Weber*, 443 U.S. at 206-07. In the educational context, the Court has underscored that "complex educational judgments" should be left largely to schools. *Grutter*, 539 U.S. at 328; *see also Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (noting that "[a]cademic freedom thrives . . . on autonomous decisionmaking by the academy itself" (citations omitted)). The importance of "educational autonomy"—at least in the post-secondary environment—is rooted in the First Amendment. *See Grutter*, 539 U.S. at 329 ("[G]iven . . . the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (opinion of Powell, J.) ("Academic freedom . . . long has been viewed as a special concern of the First Amendment."). Consequently, we must

accord deference to private educational decisionmakers just as we do to private business decisionmakers and public educational decisionmakers.

More importantly, schools perform a significantly broader function than do employers. The Supreme Court has long recognized that schools do more than simply teach our Nation's children the three "R's." Schools play a special role in the development of young citizens. *See Grutter*, 539 U.S. at 331 ("We have repeatedly acknowledged the overriding importance of preparing students for work and citizenship, describing education as pivotal to sustaining our political and cultural heritage with a fundamental role in maintaining the fabric of society." (internal quotation marks omitted)); *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) ("[E]ducation . . . is the very foundation of good citizenship."). Educational opportunity is crucial to the development of tomorrow's leaders. *See Grutter*, 539 U.S. at 332 ("In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity.").

Primary and secondary school education is the gateway to higher education and is of paramount importance for the training of our nation's workforce. *See Plyler v. Doe*, 457 U.S. 202, 221 (1982) ("[E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all."); *Cir. of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 437 (1993) (Blackmun, J., concurring) ("Our cases have consistently recognized the importance of education to the professional and personal development of the individual."). Perhaps more relevant here, increased primary and secondary school educational achievement by minority groups can obviate the downstream need for affirmative action programs by employers and institutions of higher learning. *See Johnson*, 480 U.S. at 635 (noting that very limited numbers of women and minorities possess the "specialized training and experience" required for many categories of

jobs); *Grutter*, 539 U.S. at 346 (Ginsburg, J., concurring) (noting that the need for affirmative action programs in higher education will decrease "[a]s lower school education in minority communities improves").

In sum, schools educate students for their future endeavors in society as a whole. While private employers strive primarily to make money, and public employers (such as police and fire departments) perform a specific public function, schools pursue a much broader mission: the development of all children to become citizens, leaders, and workers.

[8] The Title VII cases, in the employment context, recognize the laudable goal of achieving diversity and proportional representation in the workplace; this goal necessarily focuses *internally* and is limited to the "employer's work force." *Johnson*, 480 U.S. at 632. By contrast, ensuring that significantly underachieving minority groups are included fully as tomorrow's citizens, leaders, and workers necessarily focuses *externally*. Considering this important difference, we conclude that we should use a standard for evaluating remedial racial preferences by wholly private primary and secondary schools that is akin to that used in Title VII employment cases, but that takes into account the inherently broad and societal focus of the educational endeavor.

[9] Adjusting the first *Johnson* factor to account for this external focus, we hold that, to justify a remedial racial preference, a private school must demonstrate that specific, significant imbalances in educational achievement presently affect the target population. The external focus of the educational mission renders unnecessary the requirement of proof of a "manifest imbalance" *within* a particular school; the relevant population is the community as a whole. At the same time, the strict focus on present, demonstrable disparities in educational achievement limits the types of permissible programs and distinguishes a more amorphous program that relies solely on

general past societal discrimination. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505-06 (1989).

[10] Relatedly, the second *Johnson* factor must be modified to account for the relevant scope of inquiry. Just as imbalance should be viewed in the relevant community, rather than in a single school, so should the respective rights of members of the non-preferred group. Therefore, within the community as a whole, an admissions policy must not "unnecessarily trammel" the rights of students in the non-preferred class or "create an absolute bar" to their advancement. The third *Johnson* factor is similarly modified: an admissions policy must do no more than is necessary to remedy the imbalance in the community as a whole, that we identified at the first step. These three factors best harmonize the relevant statutes and Supreme Court cases.

Judge Bybee's reliance on *Runyon* in attacking our conclusion is particularly misplaced. As his dissent quotes several times, diss. at 19105, 19106, 19110, the Supreme Court in *Runyon* held that private primary schools in Virginia that categorically denied admission to African-American applicants represented a "classic violation of § 1981." *Runyon*, 427 U.S. at 172. Nothing in the modified *Johnson* framework that we adopt today, or indeed anywhere in this opinion, is to the contrary. Quite simply, *Runyon* is inapposite: The program at issue in *Runyon* would certainly fail the first step of our analysis because specific, significant imbalances did not exist *favoring* African-Americans. To the contrary, specific, significant imbalances did exist *disfavoring* African-Americans. The Civil Rights Act was passed specifically with the plight of African-Americans in mind. It is therefore unsurprising that the Court labeled a whites-only admissions policy a "classic violation of § 1981."

By contrast, the very nature of affirmative action plans is that historically disfavored and underachieving minorities may be given preferential treatment in certain narrowly

defined, limited programs. It is the contours of such a program—a private school's voluntary remedial admissions program—that we explore today. We turn now to applying the three modified *Johnson* factors to the Kamehameha Schools' admissions policy.

### 1. *Respond to a Manifest Imbalance*

**[11]** To meet the first modified *Johnson* factor, a private school must demonstrate that, in the relevant community, specific, significant imbalances in educational achievement presently affect the group favored by its admissions policy. The relevant community in this case is the state of Hawaii, because the Schools serve students from all of Hawaii's islands. We therefore consider whether a manifest imbalance in current educational achievement exists between Native Hawaiians and other ethnic groups in Hawaii.

Native Hawaiian students are systemically disadvantaged in the classroom. As we described earlier, there is a substantial disparity in performance between Native Hawaiian students and other ethnic groups. Briefly, Native Hawaiian students score lower on standardized tests than all other ethnic groups in the state, Ka Huakai at 229, 261, are more likely to be in special education classes, *id.* at 278, are more likely to be absent from school, *id.* at 229, and are more likely to attend poor-quality schools, *id.* at 252. Native Hawaiians are the least likely of the state's major ethnic groups to graduate from high school, *id.* at 229, 285, and they are less likely than their non-Hawaiian counterparts to attend college, *id.* at 118-19. Congress has expressly recognized the educational disadvantages suffered by Native Hawaiians and their marginalized status, 20 U.S.C. § 7512.

In view of those facts and congressional findings, it is clear that a manifest imbalance exists in the K-12 educational arena in the state of Hawaii, with Native Hawaiians falling at the

bottom of the spectrum in almost all areas of educational progress and success.

Furthermore, it is precisely this manifest imbalance that the Kamehameha Schools' admissions policy seeks to address. The goal is to bring Native Hawaiian students into educational parity with other ethnic groups in Hawaii. The stated purpose of Kamehameha Schools is to create educational opportunities to improve the capability and well-being of Native Hawaiians and to cultivate, nurture, and perpetuate Hawaiian culture, values, history, and language.

To that end, the Schools advance a curriculum specially tailored to students of Native Hawaiian descent. The Schools have pinpointed areas in which Native Hawaiians, in particular, are severely disadvantaged and have developed a curriculum to attend to those needs. The Schools have instituted a "Leadership Model" of education, meant to "restore self-identity, integrate Native Hawaiian culture, heritage, language, and traditions into the educational process, and provide a first-rate educational experience for Native Hawaiians." The Schools' efforts are aimed at increasing scores on standardized tests, increasing the number of Native Hawaiians attending colleges and graduate schools, improving Native Hawaiian representation in professional, academic, and managerial positions, and developing community leaders who are committed to improving the lives of all Native Hawaiians.

In addition, the Kamehameha Schools recognized, early on, a critical need to help perpetuate Native Hawaiian culture. As a result, in the 1940s, the Schools instituted a formal Hawaiian Cultural Program that continues today. Courses on Hawaiian history and culture are required before a student may graduate.

**[12]** The Kamehameha Schools have shown that specific, significant imbalances in educational achievement currently affect Native Hawaiians in Hawaii and that the Schools aim

to remedy that imbalance. Accordingly, they have satisfied the "manifest imbalance" criterion.

*2. Do Not Unnecessarily Trammel the Rights of Members of the Non-Preferred Class or Create an Absolute Bar to Their Advancement*

Under the second prong of the modified Title VII analysis, we ask whether, within the relevant community of Hawaii, the Kamehameha Schools' admissions policy unnecessarily trammels the rights of members of the non-preferred class, that is, students with no Hawaiian ancestry, or creates an absolute bar to their advancement.

The Kamehameha Schools allow all students to apply for admission. But once the applications are received, the Schools consider the ethnic background of the students and admit qualified children with Native Hawaiian ancestry before admitting children with no such ancestry. Because the pool of qualified potential students with Native Hawaiian blood greatly outnumbers the available slots at the Schools, non-Native Hawaiians generally are not admitted.[10] For the reasons that follow, however, the Schools' admissions policy does not unnecessarily trammel the rights of non-Native Hawaiians or create an absolute bar to their advancement.

[13] We begin by noting that nothing in the record suggests that educational opportunities in Hawaii are deficient for students, like Plaintiff, who lack any Native Hawaiian ancestry. To the contrary, the same statistical data that portray the difficulties of Native Hawaiian children generally portray much greater educational achievement, in both public and private

[10] One student without Native Hawaiian ancestry has been admitted to the Schools in recent years because, for one class, the available seats outnumbered the applicants with Native Hawaiian ancestry. *See* Timothy Hurley & Walter Wright, *Kamehameha Schools admits non-Hawaiian*, Honolulu Advertiser, July 12, 2002.

primary and secondary schools, for children of all other racial and ethnic groups in Hawaii. Those students denied admission by Kamehameha Schools have ample and adequate alternative educational options. The well-documented ability of non-Native Hawaiians to attain educational achievement in Hawaii notwithstanding the Kamehameha Schools' longstanding admissions policy demonstrates that the policy neither unnecessarily trammels the rights of non-Native Hawaiians nor absolutely bars their advancement in the relevant community.

Our inquiry does not stop there, however. The history of Native Hawaiians and of the Kamehameha Schools has certain unique features that Congress has acknowledged. In 1993, Congress admitted that the United States was responsible, in part, for the overthrow of the Hawaiian monarchy, 1993 Apology Resolution, 107 Stat. 1510. Later, when it enacted education-related legislation in 1994, and then reenacted that legislation in 2002, Congress made findings regarding the disadvantages faced by Native Hawaiian students in the public school system in Hawaii. 20 U.S.C. §§ 7901-7941, 7512(6). As part of the 2002 reenactment, a congressional committee even urged the Bishop Trust, which operates the Kamehameha Schools, to "redouble its efforts to educate *Native Hawaiian children*." H.R. Rep. No. 107-63(I), at 333 (2001) (emphasis added).

Congressional recognition of the challenges faced by Native Hawaiians in the educational arena supports our conclusion that the Schools' policy does not unnecessarily trammel the rights of non-Native Hawaiians. To the contrary, as Congress has recognized, in the unique context of Native Hawaiian history, affirmative measures are needed to address present, severe inequalities in educational achievement.

Finally, we examine the expectations of those who lack Native Hawaiian ancestry. The Supreme Court observed in *Johnson* that "the denial of the promotion [at issue] unsettled no legitimate, firmly rooted expectation on the part of peti-

tioner." 480 U.S. at 638. Similarly, here, we must ask whether Plaintiff had a legitimate, firmly rooted expectation of admission to the Schools. The answer is "no."

No applicant to the Kamehameha Schools is guaranteed admission. Just as the applicant in *Johnson* "had no absolute entitlement" to the promotion from his employer, Plaintiff here likewise "had no absolute entitlement" to admission to the Schools. *Id.*

Furthermore, the Kamehameha Schools were established when Hawaii was a sovereign nation, and they were built on the Hawaiian monarchy's land. When the Schools began, a non-Native Hawaiian had no expectation of admission to the Schools, except when Native Hawaiians failed to fill all the available slots, or until Native Hawaiians achieved educational parity with others. *See supra* p. 19058. In the intervening 118 years, the Schools' admissions policy, and therefore the expectations of the non-Native Hawaiians, has remained constant. Thus, denial of Plaintiff's application for admission "unsettled no legitimate, firmly rooted expectation." *Johnson*, 480 U.S. at 638.

For the foregoing reasons, the Kamehameha Schools' admissions policy does not unnecessarily trammel the rights of non-Native Hawaiians or create an absolute bar to their advancement.

### 3. Do No More than Is Necessary

Finally, the Schools' admissions policy must do no more than is necessary to correct the manifest imbalance suffered by students of Native Hawaiian ancestry. This factor requires that an affirmative action plan be "temporary." *Johnson*, 480 U.S. at 640; *Weber*, 443 U.S. at 208.

The Kamehameha Schools' decision to give preference to students with Native Hawaiian ancestry is limited in duration

in two distinct ways. First, if qualified students with Native Hawaiian ancestry do not apply to the Schools in sufficient numbers to fill the spots available, as happened in one recent year, *see supra* note 10, the Schools' policy is to open admissions to any qualified candidate. Second, preference will be given to students with Native Hawaiian ancestry only for so long as is necessary to remedy the current educational effects of past, private and government-sponsored discrimination and of social and economic deprivation. These dual aspects of the Kamehameha Schools' policy constitute an "[e]xpress assurance that a program is only temporary." *Johnson*, 480 U.S. at 639-40. An explicit or immediately foreseeable end date has never been required for an affirmative action plan to be valid. *See, e.g., id.* at 639 (finding the lack of an "explicit end date" "unsurprising" and upholding an employer's affirmative action plan even though "only gradual" improvements were anticipated); *see also Grutter* 539 U.S. at 343 (adopting Justice Powell's reasoning in the 25-year-old *Bakke* decision, which upheld affirmative action programs in higher education, and expecting that in 25 more years, these programs "will no longer be necessary"—a span of 50 years).

[14] Because the admissions policy is not fixed, but changes as the capacity of the Schools' programs increases and as the well-being of the Native Hawaiian community rises, the policy does no more than is necessary in light of the significant educational imbalances that Native Hawaiians continue to face.

[15] Accordingly, the Kamehameha Schools' admissions policy satisfies the three *Johnson* criteria—offset a manifest imbalance, do not unnecessarily trammel others' rights or create an absolute bar, and do no more than is necessary—as modified for the private primary and secondary school context. The Schools have shown that the admissions policy, favoring students of Native Hawaiian descent, is legitimate and valid.

Judge Bybee's dissent contends that we should hew more closely to a traditional Title VII analysis and that, under such an analysis, the Schools' preferential admissions policy is not valid. (Bybee, J., diss. at 19104-52.) For the reasons that we have detailed, we believe that the dissent's focus is too narrow for the private school context and that Kamehameha Schools' remedial admissions policy is legitimate in the face of the serious and systemic disadvantages faced by Native Hawaiian students in Hawaii today. See Johnson, 480 U.S. at 640 ("In evaluating the compliance of an affirmative action plan with Title VII's prohibition on discrimination, we must be mindful of this Court's and Congress' consistent emphasis on the value of voluntary efforts to further the objectives of the law." (internal quotation marks omitted); see also Rudebusch, 313 F.3d at 522-24 (revising the third Johnson factor to analyze quantitative rather than temporal limitations because of the context).

Even if we were to try to shove a square peg into a round hole by strictly applying the test developed in employment cases to the Kamehameha Schools' admissions policy, that policy would still be valid. As the Supreme Court has cautioned, "[i]t is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers." Weber, 443 U.S. at 201 (internal quotation marks omitted). The Kamehameha Schools' admissions policy holds true to the spirit of § 1981 by supporting Native Hawaiian students so that they may attain parity with their non-Native Hawaiian peers. See Gen. Bldg. Contractors, 458 U.S. at 386.

D. *Alternatively, and in Addition, Congress Specifically Intended to Allow the Kamehameha Schools to Operate When, in 1991, It Re-enacted § 1981.*

Plaintiff brought suit under § 1981. He has brought no constitutional claims. Thus, we are charged only with determining Congress' intent.

Congress originally enacted what later became 42 U.S.C. § 1981 in 1870. At that time, the statute did not apply in Hawaii because it was an independent, sovereign kingdom. Congress could not have had any conscious intention as to how the statute would apply in Hawaii, because it did not apply at all. When Hawaii became a territory in 1898, § 1981 applied, as it continued to do when Hawaii became a state in 1959, see Hawaiian Statehood Act, Pub. L. No. 86-3, § 15, 73 Stat. 4, 11 (1959), but it was not until 1991 that Congress again addressed and amended § 1981, see Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071. The 1991 amendments are the most recent, and indeed the only, time since Hawaii became a territory that Congress has reenacted § 1981.

Therefore, we must determine what Congress intended, with regard to Native Hawaiians, when it reenacted § 1981 in 1991. Because "[w]e assume that Congress is aware of existing law when it passes legislation," Miles v. Apex Marine Corp., 498 U.S. 19, 32 (1990), we must consider Congress' long history of providing for Native Hawaiians through legislation. See Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85 (1988) (noting that courts "generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts"). By construing § 1981 in the context of past congressional action that recognizes and provides for Native Hawaiians, we preserve the "sense and purpose" of all relevant statutes. See Watt v. Alaska, 451 U.S. 259, 267 (1981) (noting that it is the duty of the courts to give effect to differing and conflicting statutes so as to preserve their "sense and purpose"). Importantly, the Supreme Court has expressly considered contemporaneous legislation when interpreting the scope of § 1981. In Runyon, for instance, the Court relied on Congress' enactment of the Civil Rights Act of 1964 and other civil rights legislation in concluding that Congress must have intended § 1981 to reach private acts of discrimination. 427 U.S. at 174; see also Weber, 443 U.S. at 201 (noting that the application of Title VII to remedial affirmative action

plans must be read in light of its legislative history and "the historical context from which the Act arose").

Accordingly, we look to legislation that Congress has passed specifically affecting Native Hawaiians both before and after 1991. As we have explained, we consider the pre-1991 statutory landscape because it informs us about what Congress had in mind when it reenacted § 1981. We consider the post-1991 statutes to the extent that they demonstrate Congress' own understanding of § 1981. That is, we presume that Congress acts consistently with the extant body of law; statutes enacted after 1991, therefore, must be read consistently with the revised version of § 1981. See Cannon v. Univ. of Chi., 441 U.S. 677, 696-97 (1979) (concluding that elected officials are presumed to know the law, and that statutes should be read consistently with each other).

Beginning as early as 1920, Congress recognized that a special relationship existed between the United States and Hawaii. See Hawaiian Homes Commission Act, 1920, 42 Stat. 108 (1921) (designating approximately 200,000 acres of ceded public lands to Native Hawaiians for homesteading). Over the years, Congress has reaffirmed the unique relationship that the United States has with Hawaii, as a result of the American involvement in the overthrow of the Hawaiian monarchy. See, e.g., 20 U.S.C. § 7512(12), (13) (Native Hawaiian Education Act, 2002); 42 U.S.C. § 11701(13), (14), (19), (20) (Native Hawaiian Health Care Act of 1988).

Congress has relied on the special relationship that the United States has with Native Hawaiians to provide specifically for their welfare in a number of different contexts. For example, in 1987, Congress amended the Native American Programs Act of 1974, Pub. L. No. 100-175, § 506, 101 Stat. 926 (1987), to provide federal funds for a state agency or "community-based Native Hawaiian organization" to "make loans to Native Hawaiian organizations and to individual Native Hawaiians for the purpose of promoting economic

development in the state of Hawaii." A year later, Congress enacted the Native Hawaiian Health Care Act of 1988, Pub. L. No. 100-579, § 11703(a), 102 Stat. 2916 (1988), "for the purpose of providing comprehensive health promotion and disease prevention services as well as primary health services to Native Hawaiians."

Most importantly for our purposes today, Congress also has focused its attention on the educational disparities faced by Native Hawaiian students. In 1988, just three years before reenacting § 1981, Congress passed the Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988, 20 U.S.C. §§ 4901-4909 (1988) (repealed 1994) (hereinafter "Hawkins-Stafford Amendments"). Congress made extensive findings, similar to the findings that it later made in 2002, see supra pp. 19060-61, about the educational needs of Native Hawaiians and recognized the necessity for "special efforts in education recognizing the unique cultural and historical circumstances of Native Hawaiians." 20 U.S.C. § 4901(9) (1988) (repealed 1994). For instance, Congress concluded that it has the power to "specially legislate for the benefit of Native Hawaiians," encouraged Native Hawaiians to play an active role in planning and managing Native Hawaiian educational programs, and noted that Native Hawaiians disproportionally fell below their peers in terms of educational achievement and progress. Id. § 4901(2) (1988) (repealed 1994). Congress then went on to affirm specifically the mission of Kamehameha Schools and the Schools' model elementary curriculum, approving by name the Schools' continued research and assessment activities. Id. § 4904(a) (1988) (repealed 1994). Similarly, Congress directed the Secretary of Education to make grants to the Schools "for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian students." Id. § 4905(a) (1988) (repealed 1994). The sole recipients of that assistance were to be "Native Hawaiians," a term that was defined in the statute, as it is by Kamehameha Schools, as "a descendant of the aboriginal people, who prior to 1778, occu-

pied and exercised sovereignty in the area that now comprises the State of Hawaii.'" *Id.* § 4909(1)(C) (1988) (repealed 1994).

The Hawkins-Stafford Amendments were repealed in 1994, 20 U.S.C. § 4901 (1991) (repealed 1994). But for two reasons that fact does not alter the landscape of Native Hawaiian-oriented congressional enactments against which § 1981 must be read. First, when Congress reenacted § 1981 in 1991, the Hawkins-Stafford Amendments were still in effect. Second, Congress has continued thereafter to emphasize the need for special educational opportunities for Native Hawaiian students. (*See* Concurrence, pp. 19101-02.)

After reenacting § 1981, Congress passed the Native Hawaiian Education Act of 1994, 20 U.S.C. §§ 7901-7941, and then reenacted that statute in 2002, 20 U.S.C. §§ 7511-7517 (hereinafter "NHEA"). Like the Hawkins-Stafford Amendments, the NHEA recognized the special needs of Native Hawaiian students and the great disadvantages that they still face in Hawaii. *Id.* § 7512. As part of the No Child Left Behind Act of 2001, a congressional committee favorably mentioned the Bishop Trust and exhorted the Schools to "redouble [their] efforts" to provide for Native Hawaiians. H.R. Rep. No. 107-63(I), at 333.

These steadfast congressional policies favoring remedial measures for Native Hawaiians—and specifically remedial educational measures, some of them even mentioning the Schools and the Bishop Trust approvingly by name—inform our analysis of the validity of the Kamehameha Schools' admissions policy under § 1981. It would be incongruous to conclude that while Congress was repeatedly enacting remedial measures aimed exclusively at Native Hawaiians, at the same time Congress would reject such Native Hawaiian pref-

---

[19] According to the record, as we have noted, the Kamehameha Schools currently receive no money from Congress.

erences through § 1981. Moreover, by reenacting § 1981 in the midst of passing other legislation to provide specifically and particularly for the education of Native Hawaiians, Congress signaled its clear support for the Kamehameha Schools and for the validity of the Schools' admissions policy.

[16] Accordingly, the most plausible reading of § 1981, in light of the Hawkins-Stafford Amendments and the NHEA, is that Congress intended that a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy's ancestral lands, be upheld because it furthers the urgent need for better education of Native Hawaiians, which Congress has repeatedly identified as necessary.

## CONCLUSION

[17] King Kamehameha I, on his death bed, is reported to have said, "Tell my people I have planted in the soil of our land the roots of a plan for their happiness." *Princess Pauahi Bishop and Her Legacy* at 122. His great granddaughter, Princess Bernice Pauahi Bishop, echoed that sentiment when she established, through her will, the Kamehameha Schools. Because the Schools are a wholly private K-12 educational establishment, whose preferential admissions policy is designed to counteract the significant, current educational deficits of Native Hawaiian children in Hawaii, and because in 1991 Congress clearly intended § 1981 to exist in harmony with its other legislation providing specially for the education of Native Hawaiians, we must conclude that the admissions policy is valid under 42 U.S.C. § 1981.

AFFIRMED.

W. FLETCHER, Circuit Judge, with whom Judges PREGERSON, REINHARDT, PAEZ, and RAWLINSON join, concurring:

I fully concur with Judge Graber's majority opinion. However, I write separately because there is an easier and narrower ground for upholding Kamehameha Schools' admissions policy.

The question in this case is whether 42 U.S.C. § 1981 forbids Kamehameha Schools from giving Native Hawaiian applicants a conclusive preference for admission into its K-12 programs. In answering this question, the majority opinion assumes that "Native Hawaiian" is a racial classification." Op. at 19067 n.9. Based on this assumption, it holds that § 1981 permits private schools, in certain circumstances, to prefer disadvantaged minority groups — not limited to Native Hawaiians — based on race. But the case before us does not involve an admissions policy generally favoring disadvantaged minorities, or favoring specific racial or ethnic groups such as African-Americans or Hispanics. It involves only an admissions policy favoring "Native Hawaiians," defined as persons "descended from the aboriginal people who exercised sovereignty in the Hawaiian Islands prior to 1778." Op. at 19058.

A narrower ground for sustaining Kamehameha Schools' admissions policy is that "Native Hawaiian" is not merely a racial classification. It is also a political classification. I would divide the question in this case into two sub-questions. First, can Congress constitutionally provide special benefits, including educational benefits, to descendants of Native Hawaiians because "Native Hawaiian" is a political classification? Second, if the answer to this question is yes, has Congress done so in § 1981?

1. Constitutionality of Preference for Native Hawaiians

Because of their history, ably recounted in the majority opinion, Native Hawaiians constitute a unique population that

has a "special trust relationship" with the United States. Congress has repeatedly "affirmed," "acknowledged," "reaffirmed," and "recognized" that relationship. See 20 U.S.C. § 7512(8)+(13); 42 U.S.C. § 11701(13)+(16), (19)+(21); see also S. Joint Res. No. 19, Pub. L. No. 103-150, 107 Stat. 1510 (1993) ("Apology Resolution"). Based on this "historical and unique legal relationship," Congress has enacted more than 150 laws that "extend to the Hawaiian people the same rights and privileges accorded to American Indian, Alaska Native, Eskimo, and Aleut communities." 42 U.S.C. § 11701(19); see Rice v. Cayetano, 528 U.S. 495, 533 (2000) (Stevens, J., dissenting); see also Jon M. Van Dyke, The Political Status of the Native Hawaiian People, 17 Yale L. & Pol'y Rev. 95, 106 n.67 (1998) (listing a sampling of statutes that provide separate benefit programs for Native Hawaiians or include them in benefit programs that assist other native people).

Congress has stated in support of such statutes that "the political status of Native Hawaiians is comparable to that of American Indians and Alaska Natives." 20 U.S.C. § 7512(12)(D), and that "[t]he authority of Congress under the United States Constitution to legislate in matters affecting the aboriginal or indigenous peoples of the United States includes the authority to legislate in matters affecting the native peoples of Alaska and Hawaii." 42 U.S.C. § 11701(17). Congress has emphasized that it "does not extend services to Native Hawaiians because of their race, but because of their unique status as indigenous people of a once sovereign nation as to whom the United States has established a trust relationship." 20 U.S.C. § 7512(12)(B).

In Morton v. Mancari, 417 U.S. 535, 539, 551 (1974), "non-Indian employees" of the Bureau of Indian Affairs challenged a hiring preference for American Indians as "invidious racial discrimination in violation of the Due Process Clause of the Fifth Amendment." The Court held that the tribal Indian classification is "political rather than racial in nature." Id. at 554 n.24. Benefits were "granted to Indians not as a discrete

19092    DOE v. KAMEHAMEHA SCHOOLS

racial group, but, rather, as members of quasi-sovereign tribal entities." *Id.* at 554. Citing the "special relationship" doctrine, the Court held that the tribal Indian classification did not trigger strict scrutiny.

The special relationship doctrine is based on an acknowledgment that the United States " 'overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people.' " *Id.* at 552 (quoting *Bd. of County Comm'rs v. Seber*, 318 U.S. 705, 715 (1943)); *see also United States v. Kagama*, 118 U.S. 375, 384 (1886) ("From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power."). The Court in *Mancari* noted that "[i]t is in this historical and legal context that the constitutional validity of the Indian preference is to be determined." 417 U.S. at 553. Since the preference "can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians," the Court held that it does not violate the equal protection component of the Due Process Clause. *Id.* at 555.

In other contexts, the Supreme Court has not insisted on continuous tribal membership, or tribal membership at all, as a justification for special treatment of Indians. In *United States v. John*, 437 U.S. 634 (1978), decided after *Mancari*, the Court held that "Indian country," as used in 18 U.S.C. § 1151, included the Choctaw Indian Reservation in Mississippi. The Court noted that for many years the Choctaw lands in Mississippi had not been reservation lands, and that some Choctaws may have been considered to be reservation Indians based on their having "one-half or more Indian blood" rather than on any tribal membership. *Id.* at 650. The Court concluded, "Neither the fact that the Choctaws in Mississippi are merely a remnant of a larger group of Indians, long ago removed from Mississippi, nor the fact that federal supervision over them has not been continuous, destroys the federal

DOE v. KAMEHAMEHA SCHOOLS    19093

power to deal with them." *Id.* at 653. In *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73 (1977), also decided after *Mancari*, the Court upheld against a due process challenge a distribution of funds to both tribal and non-tribal Indians as " 'special treatment [that] can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians.' " *Id.* at 85 (quoting *Mancari*, 417 U.S. at 555).

For its part, Congress has repeatedly provided special treatment, including distribution of funds, based on broad definitions of the terms "Indian," "native," "Native American," and "tribal organization" that encompass Indians who are not members of federally recognized tribes. *See, e.g.*, 25 U.S.C. § 479 (defining "Indian" to include "persons of one-half or more Indian blood" who are not also tribal members); *id.* § 500n (defining "natives of Alaska" as "native Indians, Eskimos, and Aleuts of whole or part blood inhabiting Alaska at the time of the Treaty of Cession of Alaska to the United States and their descendants of whole or part blood"); *id.* § 1603(c) (defining "Indian" to include "any individual who (1), irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band, or other organized group of Indians, including those tribes, bands, or groups terminated since 1940 and those recognized now or in the future by the State in which they reside, or who is a descendant, in the first or second degree, of any such member, or (2) is an Eskimo or Aleut or other Alaska Native, or (3) is considered by the Secretary of the Interior to be an Indian for any purpose"); *id.* § 1679(b)(2) (defining "Eligible Indians" to include members of non-federally recognized tribes so long as the person can demonstrate descent from an Indian resident in California as of 1852); *id.* § 2902(1) (defining "Native American" as "an Indian, Native Hawaiian, or Native American Pacific Islander"); 38 U.S.C. § 3765(4) (defining "tribal organization" to include "the Department of Hawaiian Homelands, in the case of native Hawaiians, and such other organizations as the Secretary may prescribe"); 42 U.S.C. § 3002(20) (defining "Native American" as a member of an Indian tribe or a Native

Hawaiian; 43 U.S.C. § 1602(b) (defining "Native" as "a person of one-fourth degree or more Alaska Indian (including Tsimshian Indians not enrolled in the Metlakla Indian Community) Eskimo, or Aleut blood, or combination thereof").

We observe "the time-honored presumption" that the passage of the many federal statutes benefiting Native Hawaiians, Alaska Natives, and American Indians "is a 'constitutional exercise of legislative power,'" *Rena v. Condon*, 528 U.S. 141, 148 (2000) (quoting *Close v. Glenwood Cemetery*, 107 U.S. 466, 475 (1883)). The basis for this exercise of power is Congress' conclusion that "Native Hawaiian," like "Alaska Native" and "Indian," is a political classification subject to the special relationship doctrine. Unless we were to hold that Congress cannot legislate for the special benefit of Native Hawaiians, thereby striking down the enormous swaths of the United States Code enacted pursuant to the special relationship doctrine, we must conclude that the doctrine permits Congress to provide special benefits to Native Hawaiians.

I recognize that the Court has struck down a statute granting preferential voting rights to Native Hawaiians, but voting rights are sui generis. In *Rice v. Cayetano*, 528 U.S. 495 (2000), the Supreme Court addressed a provision of the Hawaiian Constitution limiting to "Hawaiians" the right to vote in a certain statewide election. The term "Hawaiians" was generally defined as descendants of people inhabiting the Hawaiian Islands in 1778. *Id.* at 499, 509. The Court held that the Fifteenth Amendment "Congress may not authorize a State to create a voting scheme of this sort." *Id.* at 519. In so holding, the Court assumed "authority in Congress, delegated to the State, to treat Hawaiians or native Hawaiians as tribes," *id.*, but it refused to extend the special relationship doctrine to the "new and larger dimension" of voting restrictions in state elections. *Id.* at 520.

The Court in *Rice* was careful to confine its analysis to voting rights under the Fifteenth Amendment. It cautioned that

"[t]he validity of the voting restriction is the only question before us." *Id.* at 521. Emphasizing the importance and unique character of voting rights under the Fifteenth Amendment, the Court wrote, "the Amendment is cast in fundamental terms, terms transcending the particular controversy which was the immediate impetus for its enactment." *Id.* at 512. Further, the "use of racial classifications is corruptive of the whole legal order democratic elections seek to preserve." *Id.* at 517; *see also Shaw v. Reno*, 509 U.S. 630, 657 (1993) ("Racial classifications with respect to voting carry particular dangers.").

Unlike *Rice*, the case before us does not involve preferential voting rights subject to challenge under the Fifteenth Amendment. Rather, it involves the preferential provision of educational benefits. To the extent that the federal Constitution is implicated at all, the relevant text is the Equal Protection Clause of the Fourteenth Amendment. The Court in *Rice* never questioned the validity of the special relationship doctrine under the Fourteenth Amendment, and never even hinted that its Fifteenth Amendment analysis would apply to the many benefit programs enacted by Congress for Native Hawaiians, Alaska Natives, and American Indians.

I therefore conclude that Congress may, if it wishes, permit Kamehameha Schools to give preferential admissions treatment to Native Hawaiians. The remaining question is whether Congress has in fact done so under § 1981.

## II. Section 1981

When Congress enacted § 1981 in the Civil Rights Act of 1866, Act of Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27, and reenacted it four years later in the Enforcement Act of 1870, Act of May 31, 1870, ch. 114, §§ 16, 18, 16 Stat. 144, the Hawaiian Islands were still a sovereign kingdom whose people were not "within the jurisdiction of the United States." As stated

¹The 1866 statute used slightly different language, but to the same effect the statute applied to "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed." 14 Stat. 27.

by Congress, "from 1826 until 1893, the United States recognized the independence of the Kingdom of Hawaii, extended full and complete diplomatic recognition to the Hawaiian Government, and entered into treaties and conventions with the Hawaiian monarchs to govern commerce and navigation in 1826, 1842, 1849, 1875, and 1887." Apology Resolution, Pub. L. No. 103-150, 107 Stat. at 1510.

For many years after the Hawaiian Kingdom was overthrown in 1893, and even after the State of Hawaii was admitted to the Union in 1959, § 1981 posed no threat to Kamehameha Schools' preferential admissions policy. But in 1976 the Supreme Court held that § 1981 reaches both (1) admissions programs at private schools that categorically exclude African-Americans, *Runyon v. McCrary*, 427 U.S. 160 (1976), and (2) racial discrimination in private employment against whites as well as nonwhites, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976). Together, these cases intimated that § 1981 might prohibit private school admissions policies that exclude whites.

In 1991, Congress revised and reenacted § 1981. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071, 1071-72. By this time, Congress had enacted numerous statutes that provided exclusive benefit programs for Native Hawaiians or included them in benefit programs for other native peoples. Indeed, just a few years before reenacting § 1981, Congress passed many laws that gave exclusive contractual or grant benefits to Native Hawaiians and Native Hawaiian organizations.[8] Congress proclaimed that its Native

[8] *See, e.g.*, Native American Programs Act Amendments of 1987, Pub. L. No. 100-175, § 506, 101 Stat. 973, 976-78 (establishing "Revolving Loan Fund for Native Hawaiians" to promote economic and social self-sufficiency of Native Hawaiians); Jacob K. Javits Gifted and Talented Students Education Act of 1988, Pub. L. No. 100-297, tit. II § 4104, 102 Stat. 237, 238 (authorizing grants or contracts with institutions (including Indian tribes and Native Hawaiian organizations) to carry out programs or

Hawaiian benefit programs are "consistent with the historical and unique legal relationship of the United States with the government that represented the indigenous native people of Hawaii." Native Hawaiian Health Care Act of 1988, Pub. L. No. 100-579, § 2(2), 102 Stat. at 2916 (codified as amended at 42 U.S.C. § 11701), and that this relationship gives Congress "the power to specially legislate for the benefit of Native Hawaiians." Hawkins-Stafford Amendments, Pub. L. No. 100-297, tit. IV, § 4001(2), 102 Stat. at 358 (formerly codified at 20 U.S.C. § 4901(2)) (repealed 1994).

When Congress reenacted § 1981, two recently passed laws directed Kamehameha Schools — by name — to provide educational benefits to Native Hawaiians, and *only* Native Hawaiians. The Hawkins-Stafford Amendments, passed in 1988, instructed the Secretary of Education to "make grants

projects designed to meet the educational needs of gifted and talented children; Drug-Free Schools and Communities Act of 1986, Pub. L. No. 100-297, tit. I, § 5134, 102 Stat. 252, 261 (1988) (authorizing education grants, cooperative agreements, or contracts with organizations that primarily serve and represent Native Hawaiians); Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988 ("Hawkins-Stafford Amendments"), Pub. L. No. 100-297, tit. IV, §§ 4001 *et seq.* ("Education for Native Hawaiians"), 102 Stat. 130, 358-63 (repealed 1994) (authorizing and developing supplemental educational programs to benefit Native Hawaiians); Native Hawaiian Health Care Act of 1988, Pub. L. No. 100-579, 102 Stat. 2916 (authorizing programs to improve the health status of Native Hawaiians); Handicapped Programs Technical Amendments Act of 1988, Pub. L. No. 100-630, § 102, 102 Stat. 3289, 3290 (canceling the Education of the Handicapped Act to provide handicapped Native Hawaiian (and other native Pacific basin) children with a free appropriate public education); Business Opportunity Development Reform Act of 1988, Pub. L. No. 100-656, § 207, 102 Stat. 3853, 3861-62 (amending the Small Business Act by including economically disadvantaged Native Hawaiian organizations as socially and economically disadvantaged small business concerns); Indian Health Care Amendments of 1988, Pub. L. No. 100-713, § 106, 102 Stat. 4784, 4787-88 (amending the Public Health Service Act by creating a Native Hawaiian Health Professions Scholarship program).

to the Kamehameha Schools/Bernice Pauahi Bishop Estate for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian students." *Id.* § 4005(a), 102 Stat. at 360. One year before reenacting § 1981, Congress amended the Public Health Service Act to direct the Secretary to "provide funds to Kamehameha Schools/Bishop Estate for the purpose of providing scholarship assistance" to eligible Native Hawaiian students. Act of Nov. 29, 1990, Pub. L. No. 101-644, § 401, 104 Stat. 4662, 4668 (codified as amended at 42 U.S.C. §254s). These federal statutes specifically directed Kamehameha Schools to do precisely what plaintiffs in this case say is forbidden by § 1981.

It was not until the 1991 amendments to § 1981 that Congress specified that it intends courts to apply the statute to substantive discrimination by private actors. *See* 42 U.S.C. § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and against impairment under color of State law."). In order to hold for plaintiff in this case, we would have to conclude that Congress intended this provision to invalidate, *sub silentio*, the recently enacted legislation that provided loans and scholarships exclusively to Native Hawaiians at Kamehameha Schools. But this conclusion would require us to turn our back on the Supreme Court's analysis in *Mancari*, where it rejected the challenge of non-Indian plaintiffs to Indian employment preferences as inconsistent with the federal Equal Employment Opportunity Act of 1972.

The *Mancari* plaintiffs argued that

since the [Equal Employment Opportunity Act of 1972] proscribed racial discrimination in Government employment, the Act necessarily, albeit *sub silentio*, repealed the provision of the [Indian Reorganization Act of 1934] that called for the preference in the [Bureau of Indian Affairs] of one racial group, Indians, over non-Indians.

*Mancari*, 417 U.S. at 547. The 1972 Act, upon which the *Mancari* plaintiffs relied, amended Title VII of the Civil Rights Act of 1964. *Id.* at 546-47. Whereas the 1964 Civil Rights Act had expressly exempted certain Indian preferences, neither the text nor the legislative history of the amending 1972 Act made any reference to such preferences. *Id.* Given that the 1972 Act was specifically modeled on the 1964 Act, the omission of an exemption for Indian preferences was especially glaring, and the plaintiffs' argument for *sub silentio* repeal especially strong.

Nevertheless, the Supreme Court unanimously and emphatically rejected the argument for *sub silentio* repeal by the 1972 Amendment:

It would be anomalous to conclude that Congress intended to eliminate the longstanding statutory preferences in BIA employment, as being racially discriminatory, at the very same time it was reaffirming the right of tribal and reservation-related private employers to provide Indian preference. Appellees' assertion that Congress implicitly repealed the preference as racially discriminatory, while retaining the 1964 preferences, attributes to Congress irrationality and arbitrariness, an attribution we do not share.

. . . Three months after Congress passed the 1972 amendments, it enacted two new Indian preference laws . . . . It is improbable, to say the least, that the same Congress which affirmatively approved and enacted these additional and similar Indian preferences was, at the same time, condemning the BIA preference as racially discriminatory. In the total absence of any manifestation of supportive intent, we are loathe to imply this improbable result.

* * *

1910[0]        DOE v. KAMEHAMEHA SCHOOLS

This is a prototypical case where an adjudication of repeal by implication is not appropriate. *The preference is a longstanding, important component of the Government's Indian program. The anti-discrimination provision, aimed at alleviating minority discrimination in employment, obviously is designed to deal with an entirely different and, indeed, opposite problem. Any perceived conflict is thus more apparent than real.*

. . . A provision aimed at furthering Indian self-government by according an employment preference to qualified members of the BIA for qualified members of the governed group can readily co-exist with a general rule prohibiting employment discrimination on the basis of race. Any other conclusion can be reached only by *formalistic reasoning that ignores both the history and purposes of the preference and the unique legal relationship between the Federal Government and tribal Indians.*

Furthermore, the Indian preference statute is a specific provision applying to a very specific situation. The 1972 Act, on the other hand, is of general application. *Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one,* regardless of the priority of enactment.

The courts are not at liberty to pick and choose among congressional enactments, and *when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.*

*Id.* at 548-51 (emphasis added) (citations omitted).

The principal dissent insists that the failure of § 1981 to include in its text an explicit exception for Native Hawaiians

DOE v. KAMEHAMEHA SCHOOLS        19[10]1

is fatal to Kamehameha Schools' admissions policy. But of all the federal statutes to which strict text-based rules of statutory construction might be applied, § 1981 is a particularly inappropriate candidate. The text of § 1981 only guarantees "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It does not guarantee the converse — the right of white persons or citizens to enjoy the same contractual rights as non-whites. Therefore, according to the dissent's interpretive method, § 1981 should not be read to protect nonwhites against private racial discrimination. But we know that, despite the clear text of § 1981, this conclusion would be wrong, for the Supreme Court held in 1976 that whites as well as non-whites are protected under § 1981. *McDonald*, 427 U.S. at 286-87.

Congress' provision of educational benefits to Native Hawaiians continues to this day. Congress repealed the Native Hawaiian provisions of the Hawkins-Stafford Amendments only to replace them with the more comprehensive Native Hawaiian Education Act ("NHEA"), Pub. L. No. 103-382, §§ 9201 *et seq.*, 108 Stat. 3794 (1994) (formerly codified at 20 U.S.C. §§ 7901 *et seq.*) (repealed 2002), which Congress later reenacted in the No Child Left Behind Act of 2001, 20 U.S.C. §§ 7511 *et seq.* As part of the No Child Left Behind Act of 2001, a congressional committee exhorted the Bishop Trust, which finances Kamehameha Schools, to "redouble its efforts to educate Native Hawaiian children." H.R. Rep. No. 107-63[0]1, at 333.

The NHEA continues to allocate money to private non-profit organizations to provide programs for the exclusive benefit of Native Hawaiians. *See* 20 U.S.C. § 7515. Kamehameha Schools' definition of "Native Hawaiian" is virtually identical to that used in the NHEA. *See* 20 U.S.C. § 7517(1)(B) (defining "Native Hawaiian" as "a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii"). The NHEA expressly declares that "Congress

does not extend services to Native Hawaiians because of their race, but because of their unique status as the indigenous people of a once sovereign nation as to whom the United States has established a trust relationship." 20 U.S.C. § 7512(12)(B).

Through the NHEA and the myriad other federal statutes that confer benefits on Native Hawaiians, Congress has made manifest its intent to apply some form of the special relationship doctrine to Native Hawaiians. The well established general rule is that less — not more — demanding scrutiny applies to private discrimination than to government-sponsored discrimination. It would be deeply ironic for us to hold that § 1981 forbids private institutions from giving Native Hawaiians educational benefits when, at the same time, Congress itself provides such benefits and provides public funds for private organizations to do the same.

Conclusion

Congress has invariably treated "Native Hawaiian" as a political classification for purposes of providing exclusive educational and other benefits. Under the special relationship doctrine, Congress has the power to do so. I see nothing in § 1981 to indicate that Congress intended to impose upon private institutions a more restrictive standard for the provision of benefits to Native Hawaiians than it has imposed upon itself.

PRINTED FOR
ADMINISTRATIVE OFFICE, U.S. COURTS
BY THOMSON/WEST, SAN FRANCISCO

This summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2006 Thomson/West