**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN DOE, a minor, by his mother
and next friend, Jane Doe,
*Plaintiff-Appellant,*

and

JOSEPHINE HELELANI PAUAHI
RABAGO,
*Intervenor,*

v.

KAMEHAMEHA SCHOOLS/BERNICE
PAUAHI BISHOP ESTATE; CONSTANCE
H. LAU, NAINOA THOMPSON, DIANE
J. PLOTTS, ROBERT K.U. KIHUNE, J.
DOUGLAS ING, in their capacities as
Trustees of the Kamehameha
Schools/Bernice Pauahi Bishop
Estate,
*Defendants-Appellees.*

No. 04-15044

D.C. No.
CV-03-00316-ACK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Alan C. Kay, District Judge, Presiding

Argued and Submitted En Banc
June 20, 2006—San Francisco, California

Filed December 5, 2006

19193

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2006 Thomson/West

Before: Mary M. Schroeder, Chief Judge, and Harry Pregerson, Stephen Reinhardt, Alex Kozinski, Diarmuid F. O'Scannlain, Pamela Ann Rymer, Andrew J. Kleinfeld, Susan P. Graber, William A. Fletcher, Richard A. Paez, Marsha S. Berzon, Richard C. Tallman, Johnnie B. Rawlinson, Jay S. Bybee, and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Graber;
Concurrence by Judge W. Fletcher;
Dissent by Judge Bybee;
Dissent by Judge Rymer;
Dissent by Judge Kleinfeld;
Dissent by Judge Kozinski

BYBEE, Circuit Judge, with whom Judges KOZINSKI, O'SCANNLAIN, TALLMAN, and CALLAHAN join, and with whom Judges RYMER and KLEINFELD join in Parts II and III, dissenting:

This case involves the application of one of the Republic's oldest and most enduring civil rights statutes, 42 U.S.C. § 1981. That statute—originally enacted as section sixteen of the Civil Rights Act of 1870—provides in pertinent part that, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (2000). Enacted soon after the passage of the Thirteenth and Fourteenth Amendments, § 1981 like—and perhaps more than—most of the reconstruction era civil rights enactments was intended to ensure "that a dollar in the hands of [any citizen] will purchase the same thing as a dollar in the hands of a white man." *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 443 (1968). Applying that principle in *Runyon v. McCrary*, 427 U.S. 160, 168, 179 (1976), the Supreme Court held that § 1981 "prohibits private, commercially operated

non-sectarian schools from denying admission to prospective students because they are" not members of a favored racial group. Indeed, as *Runyon* makes clear, discriminating against a private school applicant solely on the basis of that applicant's race "amounts to a classic violation of § 1981." *Id.* at 172.

Despite that well-established principle, the majority today stands *Runyon* on its head and holds that a private school may deny admission to a prospective student solely because he or she is not a member of a particular race. Though I agree with the majority that Native Hawaiians suffer from severe socioeconomic disadvantages and believe that Kamehameha Schools ("Kamehameha") should be commended for attempting to remedy those hardships, I cannot concur with the majority's dramatic departure from *Runyon*.

In my view, the majority has made a number of crucial mistakes. Thus, as set out below in Part I, even though I agree with the majority that Title VII and not strict scrutiny provides the standard of review in this case, I disagree with the majority's sweeping modification of the Title VII standard. Moreover, even if I agreed with the majority's departure from that standard, I could not subscribe to the majority's decision to sanction an absolute racial bar. Likewise, as set out in Part II, I cannot accept as a matter of faithful statutory construction the majority's view that Congress implicitly exempted racial preferences for Native Hawaiians from § 1981 by passing unrelated—and even since repealed—statutes. Indeed, I believe the majority's novel approach to statutory interpretation is readily emanipulable and would enable courts to rewrite statutes whenever they want to save a particular program, contract, or enactment. Finally, as set out in Part III, because Native Hawaiians do not constitute a federally recognized tribe and Kamehameha is a private party, I also disagree with Judge Fletcher's suggestion that the special relationship doctrine of *Morton v. Mancari*, 417 U.S. 535 (1974), can save Kamehameha's racially exclusive admissions policy.

As much as I may believe that Kamehameha should be applauded for providing its students an exceptional education and for attempting to remedy the socioeconomic disadvantages facing Native Hawaiians, I cannot turn a blind eye to a classic violation of § 1981. Noble as Kamehameha's goals may be, good intentions are not license to violate our civil rights laws. Accordingly, I respectfully dissent.

## I. REVIEW OF § 1981 UNDER TITLE VII STANDARDS

The John Doe plaintiff contends that Kamehameha's admissions policy—which bars the admission of any non-Native Hawaiian student, see Maj. Op. at 19080 & n.10—violates 42 U.S.C. § 1981 because, as *Runyon v. McCrary*, 427 U.S. 160 (1976), makes clear, discriminating against a private school applicant solely on the basis of that applicant's race "amounts to a classic violation of § 1981." *Id.* at 172. Despite the inherent logic of plaintiff's argument, the majority avoids reaching a similar conclusion by holding "[q]uite simply, *Runyon* is inapposite." Maj. Op. at 19077, and grafting a modified Title VII standard onto § 1981.

To create that new standard, the majority dismisses *Runyon* as irrelevant because "[t]he program at issue in *Runyon* would certainly fail" the majority's analysis. *Id.* In so holding, however, the majority ignores the critical fact that the admissions programs involved in *Runyon*—like Kamehameha's- violated § 1981 because they used race as the determinative admissions factor. Instead, the majority converts *Runyon* into a case about a "whites-only admissions" program that is "inapposite" to Kamehameha's Native Hawaiians-only admissions policy. *Id.* I find the majority's decision to dismiss *Runyon* in order to approve a policy that bars African American (and any other) children who lack Native Hawaiian ancestry to be unfortunate and wrong.

Putting those concerns aside for the moment, and turning to the next step in the majority's analysis, the majority holds

that Title VII scrutiny, and not strict scrutiny, applies to alleged § 1981 violations, Maj. Op. at 19071-72. That second step in the majority's analysis is sound. Like the majority, I agree that Title VII standards and not strict scrutiny must apply to § 1981 actions because to hold otherwise would effectively render the Title VII's provisions that expressly contemplate affirmative action plans nonsensical. Maj. Op. at 19070-71; *see also Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498-99 (3d Cir. 1999); *Edmonson v. United States Steel Corp.*, 659 F.2d 582, 584 (5th Cir. 1981) (per curiam); *Setser v. Novack Inv. Co.*, 657 F.2d 962, 966-68 (8th Cir. 1981) (en banc).

Applying the Title VII approach, the majority also correctly holds that the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to plaintiff's § 1981 claim. *See* Maj. Op. at 19068-69. Under that test, "[t]he complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *McDonnell Douglas*, 411 U.S. at 802. Where an explicit race-based policy exists, proof of that fact alone is sufficient to establish a prima facie case. If the plaintiff proves his prima facie case, a rebuttable presumption of intentional discrimination arises, *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981), and the burden of production "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the conduct at issue. *McDonnell Douglas*, 411 U.S. at 802. "The existence of an affirmative action plan provides such a rationale." *Johnson v. Transp. Agency*, 480 U.S. 616, 626 (1987). "If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that . . . the plan is invalid." *Id.*

As Kamehameha concedes that it employs a preference that favors Native Hawaiian applicants, plaintiff has met his burden to show a prima facie case of racial discrimination. Maj. Op. at 19072. Kamehameha argues, however, that its conduct is permissible because its admissions policy was executed

pursuant to an affirmative action plan, thereby rebutting the presumption of illegality. Thus, as the majority concludes, this case hinges entirely on the third step of the *McDonnell Douglas* analysis—*i.e.*, whether Kamehameha's plan is invalid. *See* Maj. Op. at 19072-73.

It is at this point, when the majority entirely reworks the standards for determining whether an affirmative action plan is valid, that the majority's analysis goes astray. Under *United Steelworkers of America v. Weber*, 443 U.S. 193 (1979), and *Johnson v. Transportation Agency*, 480 U.S. 616 (1987), an affirmative action program must satisfy the following factors to be considered valid: (1) It must be "justified by the existence of a 'manifest imbalance'" in the employer's workforce that is reflective of traditionally segregated job categories; (2) it may not "'unnecessarily trammel[ ] the rights of [other] employees or create[ ] an absolute bar to their advancement'"; and (3) it must "be designed to do [no] more than 'attain a balance.'" *Rudebusch v. Hughes*, 313 F.3d 506, 520 (9th Cir. 2002) (first and third alteration in original) (quoting *Johnson*, 480 U.S. at 631, 637-38, 639).[1]

Reasoning that primary and secondary educational contracts are different, however, the majority alters all three factors and holds that a private school may discriminate on the basis of race whenever (1) "significant imbalances in educa-

[1] *Rudebusch* did not include the requirement that the "manifest imbalance" be present in a job category that was traditionally segregated in its statement of the Title VII test. *See* 313 F.3d at 520. However, all of the cases we cited in *Rudebusch* to support the manifest imbalance factor included the traditional segregated job category requirement in their statement of the test. *See Johnson*, 480 U.S. at 631; *Weber*, 443 U.S. at 204; *Higgins v. City of Vallejo*, 823 F.2d 351, 356 (9th Cir. 1987). *Rudebusch* gives no indication that it intentionally excluded this aspect of the requirement, and the defendant did not argue that this requirement had not been met. Thus, I do not believe that *Rudebusch* lessened the requirement that a job category must be traditionally segregated before an affirmative action plan is permissible.

tional achievement [in the community as a whole] presently affect the target population"; (2) the discriminatory policy does not "unnecessarily trammel[ ] the rights of students in the non-preferred" racial group as a whole "or create an absolute bar to their advancement"; and (3) "the [discriminatory] policy [does] no more than is necessary to correct the imbalance . . . identified at the first step." Maj. Op. at 19077.

Though I recognize that the Title VII standard was forged in the employment discrimination context and that some modification may be necessary to adapt it to other settings, I disagree, as explained below, with the majority's general justification for departing from precedent and with each specific alteration it makes to the Title VII standard. Furthermore, I also disagree with the majority's application of its own standard.

## A. The Majority's Modification of the Title VII Standard

The majority creates a standard that, by its own terms, applies *only* to primary and secondary schools. It grounds that decision entirely on its finding that the ordinary Title VII standard, which was developed in the employment setting, cannot apply to primary and secondary educational contracts. But, there is absolutely nothing in § 1981's text to suggest that contracts made with "private employers [that] strive primarily to make money[ ] and public employers [that] perform a specific public function" should be subject to a different standard than primary and secondary schools that have "a much broader [external] mission." Maj. Op. at 19076. Indeed, the majority neglects the fact that § 1981 guarantees to "[a]ll persons . . . the same right . . . to make and enforce *contracts* . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (emphasis added). Given § 1981's plain text, then, it is not surprising that the majority cannot cite a single case to support the novel proposition that primary and secondary educational contracts are different from other contracts and are entitled to special treatment under § 1981.

In fact, the Supreme Court has rejected that very argument. For instance, far from finding that a school's "much broader mission" or external focus made a difference, *Runyon*—which involved a racially exclusive primary and secondary private school admissions policy—reasoned:

It is apparent that the racial exclusion practiced by the Fairfax-Brewster School and Bobbe's Private School amounts to a classic violation of § 1981. The parents . . . sought to enter into contractual relationships with [the schools] for educational services. . . . Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments . . . . [N]either school offered services on equal basis to white and nonwhite students. . . . [Plaintiffs] were denied admission to the schools because of their race. The . . . conclusion that § 1981 was thereby violated follows inexorably from the language of that statute, as construed in [prior Supreme Court case law].

427 U.S. at 172-73 (quotation and citation omitted) (footnote omitted). Thus, the majority's argument that primary and secondary private school educational contracts should be treated differently from other contracts under § 1981 was squarely rejected in *Runyon*, and I would adhere to that precedent.

Similarly, the majority's rationale does not find any support in Title VII jurisprudence. Indeed, under Title VII the Supreme Court has uniformly measured affirmative action programs against the standard established in *Weber* as explained above. For example, *Johnson* employed *Weber* to determine the validity of a county transportation agency's affirmative action program under Title VII. 480 U.S. at 626-40; *see also id.* at 631 ("[W]e must first examine whether [the employment] decision was made pursuant to a plan prompted

by concerns similar to those of the employer in *Weber*. Next, we must determine whether the effect of the plan on [the non-preferred race] is comparable to the effect of the plan in that case."); *id.* at 627 ("The assessment of the legality of the Agency Plan must be guided by our decision in *Weber*." (footnote omitted)).

Our own jurisprudence has closely followed the Supreme Court's lead in this area, and, as the majority candidly concedes, under Title VII, we have always applied the same standard, even when the program "at issue was not wholly analogous to the hiring and promotional plans at issue in *Weber* and *Johnson* because of some significant conceptual differences between the types of plans." Maj. Op. at 19074 (citation and internal quotation marks omitted).[2] Our sister circuits have done the same, even when the case involved pri-

[2] We have considered the validity of affirmative action plans in a wide variety of contexts, and we have always applied the same Title VII standard. *See, e.g., Officers for Justice v. Civil Serv. Comm'n*, 979 F.2d 721, 723, 725-26 (9th Cir. 1992) (evaluating a police examination scoring regime designed "to promote a higher percentage of minority officers" under an unmodified Title VII standard); *Higgins v. City of Vallejo*, 823 F.2d 351, 356-58 (9th Cir. 1987) (evaluating a fire department's affirmative action program under an unmodified Title VII standard); *La Riviere v. EEOC*, 682 F.2d 1275, 1278-80 (9th Cir. 1982) (holding that affirmative action plans by public employers should be subjected to an unmodified Title VII standard, and evaluating a California Highway Patrol affirmative action program under that standard); *see also Gilligan v. Dep't of Labor*, 81 F.3d 835, 837 (9th Cir. 1996) (discussing an affirmative action program at the Department of Labor and stating that the test of its validity is an unmodified Title VII standard). Indeed, we have also ruled in multiple Title VII cases involving affirmative action practices at educational institutions, and we have never even *suggested* that conduct by such institutions might be subjected to a different standard. *See, e.g., Rudebusch*, 313 F.3d 506 (considering a university's equity pay adjustment under Title VII's standards for affirmative action programs); *Cerrato v. S.F. Cmty. Coll. Dist.*, 26 F.3d 968 (9th Cir. 1994) (affirming a district court judgment dismissing a claim, brought by a professor who was passed over for the position of dean, that challenged the district's affirmative action policy under an unmodified Title VII standard).

mary and secondary schools that have "a much broader [external] mission." *See, e.g., Taxman v. Bd. of Educ. of Twp. of Piscataway*, 91 F.3d 1547, 1564 (3d Cir. 1996) (en banc) (evaluating a plan for the hiring and firing of primary and secondary school teachers under the *Weber* standard), *cert. granted*, 521 U.S. 1117 (1997), *cert. dismissed*, 522 U.S. 1010 (1997); *Cunico v. Pueblo Sch. Dist. No. 60*, 917 F.2d 431, 437-38 (10th Cir. 1990) (evaluating a race conscious layoff plan for primary and secondary school personnel under the *Weber* standard).

The majority fails to explain why we must create a special standard for primary and secondary educational contract cases.[3] If anything, as highlighted above, *Runyon* compels the conclusion that a primary and secondary educational contract—like any other contract—that discriminates solely on the basis of race violates § 1981. *See* 427 U.S. at 172. As noted above, I also disagree with the majority's far-reaching adaption of all three of the Supreme Court's factors for determining the validity of an affirmative action program, to which I now turn.

[3]The majority's reference to the First Amendment roots of "educational autonomy," *see* Maj. Op. at 19074, is misleading since the Supreme Court has consistently rejected First Amendment interests as a justification for racial discrimination. *See, e.g., Runyon*, 427 U.S. at 176 (holding that while, "it may be assumed that parents have a First Amendment right to send their children to educational institutions that promote" racial discrimination, "it does not follow that the practice of excluding racial minorities from such institutions is also protected by the same principle"); *Norwood v. Harrison*, 413 U.S. 455, 470 (1973) (holding, "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections"); *see also Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (noting that under the First Amendment, "[t]here is no constitutional right, for example, to discriminate in the selection of who may attend a private school or join a labor union").

1. Manifest Imbalance Reflecting Traditional Segregation

The majority has substantially modified the Court's first factor. Under the first *Weber* and *Johnson* factor, the Supreme Court has required that a Title VII affirmative action program be "justified by the existence of a manifest imbalance that reflected underrepresentation of [the favored group] in traditionally segregated job categories." *Johnson*, 480 U.S. at 631 (internal quotation marks omitted); *accord Weber*, 443 U.S. at 208, 209; *id.* at 212-15 (Blackmun, J. concurring). Our cases have consistently and faithfully applied this requirement. *See, e.g., Officers for Justice v. Civil Serv. Comm'n*, 979 F.2d 721, 725 (9th Cir. 1992) ("Under Title VII analysis, voluntary adoption of a race-based remedy may be justified by a showing that a manifest imbalance exists, reflecting underrepresentation of [the favored group] in traditionally segregated job categories," (internal quotations omitted)); *Davis v. City & County of S.F.*, 890 F.2d 1438, 1448 (9th Cir. 1989) (same); *Higgins v. City of Vallejo*, 823 F.2d 351, 356 (9th Cir. 1987) (same); *La Riviere v. EEOC*, 682 F.2d 1275, 1278 (9th Cir. 1982) (applying the same standard to a sex-based affirmative action plan).

Likewise, we have consistently applied the Supreme Court's holding that "[i]n determining whether an imbalance exists that would justify taking . . . race into account, a comparison of the percentage of minorities . . . *in the employer's work force* with the percentage in the area labor market . . . is appropriate . . . ." *Johnson*, 480 U.S. at 631-32 (emphasis added); *accord Weber*, 443 U.S. at 204-206; *Davis*, 890 F.2d at 1448 ("To determine whether such an imbalance has occurred, the court may compare the percentage of minorities or women in the *employer's work force* with the percentage in the area labor market or general population." (emphasis added)); *Higgins*, 823 F.2d at 356-57 (similar).

In other words, until today, two findings were required to satisfy this first factor: (1) the present existence of a manifest

imbalance in a particular job category in the *employer's work-force*; and (2) that this imbalance stems from *historical segregation* in that job category. Those separate requirements guaranteed two critical things: First, with respect to the *scope* of the program, they guaranteed that there was a particular goal in sight—namely, representation of the historically disadvantaged group in the *employer's* workforce in proportion to its representation in the relevant labor pool. *Johnson*, 480 U.S. at 631-32, 633 n.10; *Weber*, 443 U.S. at 198-99, 208-09. By requiring a goal based on the employer's own practices, *Weber* and *Johnson* were willing to permit affirmative action programs without giving all employers license to discriminate in favor of any group that currently finds itself disadvantaged anywhere in the labor market. Second, those requirements ensured that there was a *temporal* constraint, a well-defined point after which the preference program would no longer be necessary—that is, once the "manifest imbalance" in the employer's workforce had been corrected. *Johnson*, 480 U.S. at 632 ("The requirement that 'the manifest imbalance' relate to a 'traditionally segregated job category' provides assurance both that sex or race will be taken into account in a manner consistent with Title VII's purpose of eliminating the effects of employment discrimination, and that the interests of those employees not benefiting from the plan will not be unduly infringed."); *Weber*, 443 U.S. at 208-09 ("[T]he plan is a temporary measure; it is not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance. Preferential selection of craft trainees at the Gramercy plant will end as soon as the percentage of black skilled craftworkers in the Gramercy plant approximates the percentage of blacks in the local labor force."). Moreover, an affirmative action program that correlates to an employer's own internal practices is necessarily limited in scope and time, because correcting the "manifest imbalance" is reasonably within the employer's control.

In contrast to *Weber* and *Johnson*, the majority's test merely requires a private school to "demonstrate that specific,

significant imbalances in educational achievement presently affect the target population" in the relevant community.[4] Maj. Op. at 19076. Thus, by completely eliminating any school-based analysis and jettisoning any historical inquiry,[5] the majority rejects the constraint developed in the Title VII context that affirmative action programs must be limited in scope and duration. Indeed, the majority effectively green-lights discrimination so long as the identified group currently suffers from "significant imbalances in educational achievement." *Id.* at 19079. Because such a *broad* and *perpetual* license conflicts with the Supreme Court's consistent emphasis on the *limited* and *temporary* nature of permissible affirmative action plans, *see, e.g., Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 475-79 (1986), I cannot endorse the majority's new standard. *See also, e.g., Grutter v. Bollinger*, 539 U.S. 306, 342 (2003) ("The requirement that all race-conscious admissions programs have a termination point 'assure[s] all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself.'" (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 510 (1989) (plurality opinion)); *Weber*, 443 U.S. at 208 (noting the affirmative action plan in that case was "a temporary measure"); *W. States Paving Co., Inc. v. Wash. State Dep't of Transp.*

[4] It is not entirely clear what constitutes the relevant community under the majority's new test, but it appears the majority means the state where the affirmative action program has been adopted. *See* Maj. Op. at 19076. For instance, in announcing its new test, the majority maintains that "the relevant population is the community as a whole." *id.*, but when the majority applies that test, it appears that, "[t]he relevant community in this case is the state of Hawaii." *id.* at 19078.

[5] Whereas the majority justifies neither purge, the second modification is particularly puzzling given the majority's repeated suggestion that history is of particular significance in this case. *See, e.g., id.* at 19054-56 & n.2 (providing detailed information on Hawaiian history to "set[] []the stage for our more particular consideration of the educational status of Native Hawaiian children"); *id.* at 19072 ("The question remains how best to adapt the Title VII employment framework to an educational context and to the *unique historical circumstances* of this case." (emphasis added)).

407 F.3d 983, 994 (9th Cir. 2005) ("A narrowly tailored remedial program must also include adequate durational limitations."); *Smith v. Univ. of Wash.*, 392 F.3d 367, 375 (9th Cir. 2004) ("[R]ace-conscious admissions programs must be limited in time.").

## 2. Unnecessary Trammeling the Rights of the Non-Preferred Group

The majority's alteration of *Weber* and *Johnson*'s second factor is similarly problematic. Under the second factor, an affirmative action plan must not "unnecessarily trammel[ ] the rights of [members of the disfavored group] or create[ ] an absolute bar to their advancement." *Johnson*, 480 U.S. at 637-38; *accord Weber*, 443 U.S. at 208. The majority echoes this test, Maj. Op. at 19077, but it makes two important modifications.

First, under the majority's test, whether a discriminatory policy creates an absolute bar or unnecessarily trammels the rights of the disfavored race is determined by reference to "the respective rights of members of the non-preferred group" "viewed in the relevant community, rather than in a single school." Maj. Op. at 19077. Thus, under the majority's new standard, we must not consider the rights of a non-preferred individual at the institution in question but in the larger context of his ability to access quality education. *See id.* at 19077. Again, as indicated above, that standard conflicts with the established principle that we look at the particular institution adopting the affirmative action program to determine whether the rights of a member of the disfavored group have been trammeled. *See, e.g., Johnson*, 480 U.S. at 638 ("[W]hile petitioner in this case was denied a promotion, he retained his employment with the Agency, at the same salary and with the same seniority, and remained eligible for other promotions."); *id.* at 638 n.15 ("Of the 111 new Skilled Craft jobs [at the Agency] during [the relevant] period, 105, or almost 95%, went to men."); *id.* at 642 ("The decision to [hire Joyce

instead of the plaintiff] was made pursuant to an affirmative action plan that represents a moderate, flexible, case-by-case approach to effecting a gradual improvement in the representation of minorities and women *in the Agency's work force*." (emphasis added); *Weber*, 443 U.S. at 208 ("The plan does not require the discharge of white workers and their replacement with new black hirees. Nor does the plan create an absolute bar to the advancement of white employees; half of those trained in the program will be white." (citation omitted)).

Indeed, it is contrary to the spirit—and, I had always assumed, based on the cases cited above, the letter—of the civil rights laws to explain to a worker who has been discriminated against that the situation is not so bad because there are lots of other jobs available. Yet that is the essence of the majority's new standard. If the majority thinks there are adequate educational alternatives for the disfavored race, then the fact that the institution in question has discriminated against that race is of no concern. "Context" alone cannot explain why, under the majority's view, racial discrimination in some communities would be wrong and actionable, but in other communities, it would be acceptable and praiseworthy. I cannot join the majority's analysis.

The majority makes a second important modification and announces that in determining whether an affirmative action plan trammels rights or creates an absolute bar, we do not look at whether *an individual* has been denied an opportunity, but whether *the individual's racial group* "within the community as a whole" has been denied an opportunity. *See* Maj. Op. at 19080-81 (holding that because "nothing in the record suggests that educational opportunities in Hawaii are deficient for *students, like Plaintiff, who lack any native Hawaiian ancestry*," Kamehameha's admissions "policy neither unnecessarily trammels the rights of non-Native Hawaiians nor absolutely bars their advancement in the relevant community." (emphasis added)); *id.* at 19081 (holding that because "[non-Native Hawaiian] *students* denied admission by Kamehameha

Schools[,] as "statistical data" demonstrates,] have ample and adequate alternative educational options." Kamehameha's admissions policy does not unnecessarily trammel rights or create an absolute bar (emphasis added). That standard, however, conflicts with both the plain meaning of § 1981 and the basic premise that civil rights laws are "design[ed] to protect *individuals* of all races," *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 288 n.19 (1976) (emphasis added), and "not merely a group of individuals, or a body of persons according to their numbers." *Mitchell v. United States*, 313 U.S. 80, 97 (1941). Since, by its own terms, § 1981 "explicitly applies to '*all persons*'" and not simply groups of individuals, *McDonald*, 427 U.S. at 287 (quoting 42 U.S.C. § 1981(a)), the majority's holding that § 1981 protects groups instead of "*all persons*" contradicts the statute's plain meaning.[6] Indeed, as the Supreme Court has made clear, "[§] 1981, at a minimum, reaches discrimination against *an individual* because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of *homo sapiens*." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) (emphasis added) (internal quotation marks omitted), and not

[6]Recognizing that the majority's new standard conflicts with § 1981's plain text, Judge Fletcher suggests that "of all the federal statutes to which strict text-based rules of statutory construction might be applied, § 1981 is a particularly inappropriate candidate," because under a plain-text reading "'§ 1981 should not be read to protect nonwhites [sic] against private racial discrimination." Conc. Op. at 19101. Because *McDonald* departed from Judge Fletcher's plain-text reading of § 1981, he reasons that we should reject the plain text of § 1981 altogether and turn to unrelated, repealed legislation and the pronouncement of a single congressional committee to interpret § 1981. *Id.*, at 19101-02. What Judge Fletcher forgets, however, is that *McDonald* stands for exactly the opposite proposition, namely that "the *language* and history of § 1981" demonstrate that "§ 1981 is applicable to racial discrimination in private employment against white persons." 427 U.S. at 286-87 (emphasis added). Indeed, applying the plain text of the statute, *McDonald* emphasized that, "the statute explicitly applies to 'all persons,' including white persons." *Id.* at 287 (emphasis omitted); *see also id.* at 287-96 (discussing the history of § 1981).

simply, as the majority holds, racial groups *qua* racial groups. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (holding that under Title VII "the ultimate issue is . . . the reason[] for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace"); *accord Connecticut v. Teal*, 457 U.S. 440, 453-54 (1982) ("[Title VII's] principal focus . . . is the protection of the individual employee, rather than the protection of the minority group as a whole."); *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579 (1978) (stating that an employer must "provide an equal opportunity for *each* applicant regardless of race, without regard to whether member's of the applicant's race are already proportionately represented in the workforce").

This bedrock principle has its origins in the history of the Fourteenth Amendment, from which § 1981 derives. The Equal Protection Clause provides in pertinent part that, "No State shall . . . deny to any *person* within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis added). Just as courts have read Title VII and—until now—§ 1981 to protect individual rights, courts have consistently held that the Equal Protection Clause "protect[s] *persons, not groups*." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Accordingly, the Supreme Court has required that "*group classification*[s] . . . be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed." *Id.*; *accord Mitchell*, 313 U.S. at 97 ("It is the individual . . . who is entitled to the equal protection of the laws,—not merely a group of individuals . . . ."); *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) ("The rights established [by the Fourteenth Amendment] are personal rights."); *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 349-351 (1938) (similar); *McCabe v. Atchison, Topeka, & Santa Fe Ry. Co.*, 235 U.S. 151, 161-62 (1914) (similar); *J.E.B. v. Alabama*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring in judgment) ("The neutral phrasing of the Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals,

not groups (though group disabilities are sometimes the mechanism by which the State violates the individual right in question.")

This principle is manifest in one of the cornerstones of our modern civil rights laws, *Shelley v. Kraemer*, 334 U.S. 1. In *Shelley*, the Supreme Court rejected the argument that because courts could enforce racially restrictive covenants equally against both whites and African Americans, enforcing a racially restrictive covenant against African Americans in that case did not violate the Equal Protection Clause. *Id.* at 21-22. In so holding, *Shelley* reasoned that because "[t]he rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual . . . [i]t is . . . no answer to . . . say that the courts may also be induced to deny white persons rights of ownership and occupancy on grounds of race or color." *Id.* at 22. Indeed, "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities." *Id.* Contrary to *Shelley*, the majority holds that equality *can* be achieved "through indiscriminate imposition of inequalities." *Id.*[7]

As there is no reason to depart from the plain meaning of § 1981 or the framework espoused in *Shelley*, I would follow Supreme Court precedent by considering the rights of individuals, not of groups. Consequently, I cannot concur in the majority's modification of the second *Weber* and *Johnson* factor.

3. Attaining a Balance

Finally, the majority reworks the third *Weber* and *Johnson* factor, which requires that an affirmative action plan be "in-

---

[7]The majority's reasoning cannot be limited to the § 1981 context. Indeed, if equality can only be achieved through inequality, it is unclear why the majority's rationale would not apply with equal force to employment, housing, or public schools.

tended to *attain* a balanced work force, not to maintain one." *Johnson*, 480 U.S. at 639; *accord Weber*, 443 U.S. at 208 (holding an affirmative action "plan [should be] a temporary measure[,] . . . not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance"). Though the Supreme Court has not required that *all* affirmative action programs contain an explicit end date, *Johnson* also holds that, "Express assurance that a program is only temporary may be necessary if the program actually sets aside positions according to specific numbers." 480 U.S. at 639-40. Indeed, in such cases, a sunset provision is "necessary both to minimize the effect of the program on other employees, and to ensure that the plan's goals '[are] not being used simply to achieve and maintain . . . balance.'" *Id.* at 640 (quoting *Weber*, 478 U.S. at 477-78; *accord Taxman v. Bd. of Educ. of Twp. of Piscataway*, 91 F.3d 1547, 1564 (3d Cir. 1996) (en banc) ("[B]oth *Weber* and *Johnson* unequivocally provide that valid affirmative action plans are temporary measures that seek to attain, not maintain a permanent racial . . . balance." (internal quotation marks omitted)), *cert. granted*, 521 U.S. 1117 (1997), *cert. dismissed*, 522 U.S. 1010 (1997).

Under the third factor, the majority properly recognizes that an affirmative action "admissions policy must do no more than is necessary to correct" a racial imbalance and must be "temporary." Maj. Op. at 19082; *accord id.* at 19077. Proclaiming that "[a]n explicit or immediately foreseeable end date has never been required for an affirmative action plan to be valid," Maj. Op. at 19083, however, the majority completely ignores *Johnson's* suggestion that even a *partial preference* should be checked by an *explicit sunset provision*, by holding that Kamehameha's *absolute preference* need not contain a sunset provision at all. *See* Maj. Op. at 19082 (holding that Kamehameha may use race as an exclusive admissions factor "so long as is necessary to remedy the current educational effects of past, private, and government-sponsored discrimination and of social and economic deprivation"; *id.* at 19079 ("The goal [of Kamehameha's admissions

policy] is to bring Native Hawaiian students into educational parity with other ethnic groups in Hawaii."); *see also id.* at 19082 (noting that in the last "118 years, the Schools' admissions policy . . . has remained constant"). The majority thus not only rejects *Johnson* but also the Court's admonishment that "race-conscious admissions policies . . . however compelling their goals, are potentially so dangerous that they . . . must have reasonable durational limits." *Grutter*, 539 U.S. at 342 (internal quotation marks and emphasis omitted); *accord id.* ("The requirement that all race-conscious admissions programs have a termination point assure[s] all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself." (internal quotation marks omitted)).

Far from placing a durational limit on Kamehameha's use of race as a dispositive admissions factor, the majority actually sanctions the use of race in perpetuity. For example, since few, if any, private parties will be able to correct "significant imbalances in educational achievement" in the entire "target population" through their own individual action, the majority's standard effectively issues private schools a license to engage in perpetual racial discrimination. Because such a limitless use of race in determining admissions contravenes precedent, the majority's retooling of *Johnson* and *Weber*'s third factor is also unsound.

B.  *Applying the Majority's Standard to Kamehameha*

Even if I were to agree with the majority's modifications to the Supreme Court's Title VII standard, I could not agree with its application of that standard in this case.

1.  A Manifest Imbalance Presently Affecting the Target Population

Under the majority's modified first factor, "to justify a remedial racial preference, a private school must demonstrate

---

that specific, significant imbalances in educational achievement presently affect the target population" in the relevant community. Maj. Op. 19077. I have explained above in Part I.A.1. why the majority's test is fundamentally flawed and conflicts with precedent. The majority's modifications—eliminating any focus on the schools' own population and any reliance on historical practices—relieves Kamehameha of the burden of demonstrating its policy is limited in scope and duration. For the reasons I explain in the next two sections, Kamehameha's affirmative action program fails both inquiries. Nevertheless, under the majority's modest thesis, Kamehameha's admissions policy arguably survives the first revised factor because it is clear that Native Hawaiians suffer from significant imbalances in educational achievement relative to *most* other ethnic groups in Hawaii.

2.  Unnecessarily Trammel the Rights of the Non-Preferred Racial Group

Under the majority's second prong, "we ask whether, within the relevant community of Hawaii, the Kamehameha Schools' admissions policy unnecessarily trammels the rights of the non-preferred class, that is, students with no Hawaiian ancestry or creates an absolute bar to their advancement." Maj. Op. at 19080. The majority holds that Kamehameha does not run afoul of this prong because: (1) "[t]he history of Native Hawaiians and of Kamehameha Schools has certain unique features that Congress has acknowledged"; (2) "nothing in the record suggests that educational opportunities in Hawaii are deficient for [non-Native Hawaiian] students"; (3) non-Native Hawaiians have no "legitimate, firmly rooted expectation of admission to the Schools"; and (4) "Kamehameha allows all students to apply for admission," though "once the applications are received, the Schools consider the ethnic background of the students and admit qualified children with Native Hawaiian ancestry before admitting children with no such ancestry." Maj. Op. at 19080-82. None of these

explanations is sufficient to justify Kamehameha's admissions policy even under the revised standard.

For example, the majority's first finding is irrelevant. The mere fact that "Congress admitted that the United States was responsible, in part, for the overthrow of the Hawaiian monarchy," and that Congress has recognized "the challenge faced by Native Hawaiians in the educational arena" and has urged Kamehameha to "redouble its efforts to educate *Native Hawaiian* children," Maj. Op. at 19|81 (quoting H.R. Rep. No. 107-63(I), at 333 (2001)), says absolutely nothing about whether Kamehameha's policy unnecessarily trammels rights or creates an absolute bar. Moreover, the statements the majority relies on also say nothing about whether Congress has ever been aware of Kamehameha's no non-Native Hawaiians policy, let alone endorsed it. Indeed, it is unreasonable to conclude, as the majority does, that by briefly endorsing the schools' larger educational goals in a committee report that does not even accompany a piece of legislation, Congress intended to sanction the requirements of an otherwise infirm affirmative action plan.[8]

[8] Indeed, considered in total, the paragraph that the majority relies on provides remarkably little support for its position:

The Committee has also eliminated [certain of] the Native Hawaiian specific programs formerly authorized . . . . The Committee's rationale for repealing these programs is the fact that similar assistance is available to all students, including Native Hawaiians, under [other federal] programs . . . . Unlike other indigenous populations, Native Hawaiians have a trust, established by the last Hawaiian princess, which exists solely to educate Native Hawaiian children. The Bishop Trust is currently one of the largest charitable trusts in the world, valued in excess of $10 billion, and holds approximately 8 percent of all land in the State of Hawaii as well as a 10 percent share of Goldman Sachs. The Committee urges the Trust to redouble its efforts to educate Native Hawaiian children. The Committee also believes that these children should be given the same opportunities afforded to all of our children under the programs authorized in this and other acts.

H.R. Rep. No. 107-63(I), at 333 (2001).

The majority's second finding—that non-Native Hawaiians have other educational opportunities—also fails to justify the majority's holding that Kamehameha's admissions policy does not create an absolute bar or trammel the rights of the non-preferred race. In fact, as I have previously discussed, at pp. 19|16-20, *supra*, I believe that considering non-Native Hawaiians' alternatives in this way is unsound under prevailing civil rights case law. But even neglecting that fact, such reliance is particularly problematic here. Kamehameha has an illustrious network of alumni and a record of success that exceeds that of any other school in Hawaii. The tremendous trust corpus of the Bishop Foundation enables Kamehameha to offer this excellent education at a severely discounted price: as the majority notes, the cost of educating each student approaches $20,000 annually, but tuition at Kamehameha is less than 10% of this figure, and most students receive financial aid. *See* Maj. Op. at 19|57-58. No other school in Hawaii offers the same benefits at such low cost. Thus, the majority's second justification flies in the face of logic and cannot justify the majority's holding.

I find the majority's next finding—that because for the last "118 years, the Schools' admissions policy . . . has remained constant," non-Native Hawaiians have no "legitimate, firmly rooted expectation of admission to the Schools," Maj. Op. at 19|82 (citation omitted)—to be unavailing.[9] In other words,

[9] Moreover, the majority ignores what *Johnson* actually said. The plaintiff in that case was eligible for promotion but he had to compete with seven other applicants who could have been promoted over him. 480 U.S. at 638. Accordingly, he did not have a "firmly rooted expectation" in the position he was denied. *Id.* ("[P]etitioner had no absolute entitlement to the road dispatcher position. Seven of the applicants were classified as qualified and eligible, and the Agency Director was authorized to promote any of the seven. *Thus*, denial of the promotion unsettled no legitimate, firmly rooted expectation on the part of petitioner." (emphasis added)). Nowhere did *Johnson* hold, as the majority concludes, however, that knowledge of a long-standing discriminatory policy justifies discriminatory decisions made pursuant to that policy.

according to the majority, because non-Native Hawaiians have been discriminated against on the basis of their race for a long time, they have no cause of action under § 1981. This view is contrary to history and logic. Perhaps more than any other enactment in our history, the Fourteenth Amendment and the civil rights acts unsettled the expectations of an entire nation accustomed to judging people by their race. Surely the schools in *Runyon* would have found no defense by arguing that their exclusionary policies were open and notorious and that African-American students had "no expectation of admission to the Schools." Maj. Op. at 19082. Advising non-Native Hawaiians that they have no possibility of admission to Kamehameha may settle their expectations, but it does not—for that reason—make the policy lawful.

Lastly, the majority's final justification for holding that Kamehameha's admissions policy does not unnecessarily trammel rights or create an absolute bar is absolutely wrong. The majority begins by noting that "[t]he Kamehameha Schools allow all students to apply for admission. But once the applications are received, the Schools consider the ethnic background of the students and admit qualified children with Native Hawaiian ancestry before admitting children with no such ancestry." Maj. Op. at 19080; accord id. at 19082-83 (noting, "if qualified students with Native Hawaiian ancestry do not apply to the School in sufficient numbers to fill the spots available, as happened in one recent year, the Schools' policy is to open admissions to any qualified candidate. (footnote omitted) (emphasis added). The majority then notes, in a bit of an understatement, that, "[b]ecause the pool of qualified potential students with Native Hawaiian blood greatly outnumbers the available slots at the Schools, non-Native Hawaiians generally are not admitted." Id. at 19080. Highlighting the understated nature of its conclusion, the majority then proceeds to drop a footnote explaining that its euphemistic phrase "generally are not admitted" means that, *from 1962 until 2002, Kamehameha admitted exactly one student who was not of Native Hawaiian descent. Id.* at 19080 n.10.

Proceeding as if its statement that Kamehameha generally does not admit non-Native Hawaiians proves that Kamehameha's policy is not an absolute bar, the majority entirely neglects to mention the circumstances surrounding the admission of that lone non-Native Hawaiian student. Because those circumstances speak volumes about Kamehameha's policy, however, they deserve an extended discussion.

In 1962, Kamehameha reversed its previous policy of allowing the children of faculty members to attend. Thereafter, the school did not admit a single non-Native Hawaiian student until 2002, when it admitted one non-Native Hawaiian student to its Maui campus. In response to a firestorm of protests following that decision, Kamehameha's trustees repeatedly apologized to the Native Hawaiian community, stated that the "situation" had "brought the problems with the admissions process into sharp focus," Members of Trs. of Kamehameha Sch., *Kamehameha's Policy Will Remain*, HONOLULU ADVERTISER, July 27, 2002, and acknowledged that they had "screwed up major," Rick Daysog, *Angry Ohana Grills Trustees*, HONOLULU STAR-BULLETIN, July 16, 2002. "As a result," the trustees "pledged to . . . carefully review [Kamehameha's] admissions process." Members of Bd. of Trs. of Kamehameha Sch. *supra*, presumably to prevent such a "situation" from happening again.

Far from an empty promise, Kamehameha promptly made several significant changes to its admission practices. First, it created the Ho'oulu Hawaiian Data Center to develop a Native Hawaiian registry and certify the Hawaiian ancestry of the schools' applicants; to be considered under the school's preference policy, an applicant's ancestry must now be verified by the data center."[9] Second, Kamehameha temporarily

---

[9] I note that in 2003, Kamehameha admitted a student to its seventh grade class whose application identified his maternal grandfather as Native Hawaiian. One week before school was set to begin, Kamehameha learned that the student's mother was adopted and probably lacked *biolog-*

waived application fees for its Maui and Big Island campuses in order to induce more Native Hawaiians to apply for admission. Third, Kamehameha further increased the number of Native Hawaiians applying to its Big Island campus by allowing certain students, who had previously only been eligible for admission to its main campus in O'ahu, to apply for admission at the Big Island campus." Fourth, Kamehameha also ceased its preliminary screening for O'ahu and Big Island applicants.

And fifth, Kamehameha ceased using a minimum scoring threshold to evaluate applicants. Since 1989, Kamehameha had required applicants to achieve a minimum composite score on an admissions test in order to be deemed "qualified applicants." Vicki Viotti, *Kamehameha Standards Debated*, Honolulu Advertiser, Nov. 17, 2003, at 1B. Though that test was hardly an impediment to the school's preference policy—as 2002 marked the first time in four decades that the school had space to admit a non-Native Hawaiian student—it did at least provide an objective way to measure the number of qualified Native Hawaiian applicants. By eliminating that test, however, Kamehameha did away with that objective measure, while leaving in place "Kamehameha Schools' admissions policy . . . to give preference to applicants of Hawaiian ances-

-ical Hawaiian ancestry. Kamehameha immediately rescinded the student's acceptance. Ultimately, Kamehameha settled the case and agreed to allow the student to complete his education at Kamehameha. *See* David Waite, *Boy Sues Kamehameha*, Honolulu Advertiser, Aug. 19, 2003, at 1B; David Waite & Vicki Viotti, *Kamehameha Settles Kaua'i Boy's Lawsuit*, Honolulu Advertiser, Nov. 29, 2003, at 1A; *see also* Vicki Viotti & Mike Gordon, *Kamehameha Settlement OK'd*, Honolulu Advertiser, Dec. 5, 2003, at 1B (stating that the district court indicated it believed that, legally, the boy was Native Hawaiian).

19Kamehameha's flagship campus on O'ahu receives approximately ten applications for every available opening, so reducing its applicant pool did not present the danger that the school would not receive enough qualified Native Hawaiian applicants.

try to the extent permitted by law." Kamehameha Schools Admissions Office, Main Page, http://www.ks-bc.edu/admissions/mainpage.html (last visited Sep. 7, 2006). Thus, because that policy provides no objective guidance whatsoever, Kamehameha's decision leaves it free to restrict admission solely to Native Hawaiian children, and as the trustees promised, Kamehameha need never admit a non-Native Hawaiian applicant again. This description is not meant to criticize Kamehameha's noble mission to help Native Hawaiians receive a quality education, but only to demonstrate that its current policy—contrary to the majority's creative characterization—does pose an absolute bar to the admittance of any non-Native Hawaiian students. And, such bar violates section 1981.

3. Do No More Than Is Necessary to Correct a Manifest Imbalance

Similarly, I must dissent from the majority's analysis under its third prong. Under that prong, as modified by the majority, Kamehameha's "admissions policy must do no more than is necessary to correct the manifest imbalance suffered by students of Native Hawaiian ancestry." Maj. Op. at 9082. To hold that Kamehameha's admissions policy survives this factor, the majority asserts that Kamehameha's policy is both flexible and limited. *Id.* at 9082-83. As for the former, the majority finds that Kamehameha's admissions policy "does not do more than is necessary" because that "policy is not fixed but changes as the capacity of the Schools' programs increases and as the well-being of the Native Hawaiian community rises." Maj. Op. at 9082. The majority fails to provide any support for that conclusion, and that lack of support is far from surprising given that, as demonstrated above, Kamehameha has only made its race based admission program more rigid. *see supra* at pp. 9127-28.

The majority also finds that Kamehameha's admissions policy is "limited in duration" by the fact that "if qualified"

students with Native Hawaiian ancestry do not apply to the School in sufficient numbers to fill the spots available, as happened in one recent year, the Schools' policy is to open admissions to any qualified candidate" and the admissions policy will end when "the current educational effects of past, private and government-sponsored discrimination and of social and economic deprivation" end. Maj. Op. at 19082 (footnote omitted). Because, as the majority candidly concedes, "there are many more qualified students of Hawaiian ancestry than there are available places at the Schools," id. at 19058, and Kamehameha altered its admissions criteria in response to what "happened in one recent year," id. at 19082, it is unclear whether Kamehameha will ever admit another non-Native Hawaiian student, *let alone end its racially exclusive admissions policy.* I cannot understand how Kamehameha's policy can reasonably be described as "limited in duration."[12]

As Kamehameha's own trustees put it, "[Our policy] must remain [in place] until Hawaiians are leading in scholastic achievement, until they are underrepresented in prisons and homeless shelters, until their well-being is restored." Trs. of Kamehameha Sch., *Kamehameha Schools' Policy Advocates Social Justice*, HONOLULU ADVERTISER, Aug. 24, 2003. And. according to its website, "Kamehameha Schools' mission is to fulfill Pauahi's desire to create educational opportunities in

---

[12] Moreover, Kamehameha's own admissions policy may help perpetuate that policy indefinitely. Because Kamehameha bases its admissions decisions heavily on an applicant's prior academic performance, it selects the highest-performing Native Hawaiian students from the public school population, and that necessarily depresses that population's average performance in public schools. *See* Vicki Viotti, *Kamehameha Standards Debated*, HONOLULU ADVERTISER, Nov. 17, 2003, at 1B. By continually passing over the lower performers, the Native Hawaiian population will likely continue to underperform in public schools relative to its peers. If "preference [may] be given . . . for so long as is necessary to remedy the current educational effects," Maj. Op. at 19082, Kamehameha's policy has no reasonable end in sight.

perpetuity to improve the capability and well-being of people of Hawaiian ancestry." *See* Kamehameha Schools Admissions Office, Main Page, http://www.ksbe.edu/admissions/mainpage.html (last visited Sep. 7, 2006). Because such a perpetual use of race in admissions has no limit, I cannot join the majority in holding that Kamehameha's admissions policy does no more than is necessary and therefore survives the modified third factor.

\* \* \* \* \*

The Supreme Court has long warned that "[c]lassifications of [persons] solely on the basis of race . . . threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (citations omitted). And as we have stated, "race-conscious programs must be designed to minimize—if not avoid—burdens upon nonculpable third parties." *Coral Constr. Co. v. King County*, 941 F.2d 910, 917 (9th Cir. 1991. Nothing in the majority's opinion reassures me that Kamehameha has made that effort, and I must dissent from the majority's analysis.

II.    CONGRESSIONAL EXEMPTION OF KAMEHAMEHA FROM § 1981

As an additional justification for its decision, the majority asserts that Kamehameha's policy does not violate § 1981 because Congress implicitly exempted racial preferences for Native Hawaiians from § 1981's coverage. The majority, joined to some extent by Judge Fletcher's concurrence, accomplishes this with three premises: First, the majority reasons that because § 1981 was enacted in 1870, prior to the acquisition of Hawaii. "Congress could not have had any conscious intention as to how [§ 1981] would apply in Hawaii." Maj. Op. at 19085. Second, "Congress reenacted § 1981 in 1991." *Id.* at 19088. Third, "Congress has passed [legislation] specifically affecting Native Hawaiians both before and after

1991," and to read these acts "consistently with the revised version of § 1981," we must read an exemption for Native Hawaiians into § 1981. Id. at 19086-87. Indeed, according to the majority, this is "the most plausible reading of § 1981." Id. at 19089.

Each of the majority's premises is either demonstrably wrong or utterly irrelevant. First, the majority's claim that "Congress could not have had any conscious intention as to how [§ 1981] would apply in Hawaii" is just plain wrong. Maj. Op. at 19085. As the majority observes, when Congress first enacted § 1981 as part of the Civil Rights Act of 1870, the Hawaiian Islands were still a sovereign kingdom whose people remained outside the jurisdiction of the United States. The United States did not annex Hawaii until the 1890s. See Maj. Op. at 19056, 19085. It is clear, then, that Congress could not have *initially* intended either to cover or to exempt Native Hawaiians from § 1981's provisions. But nothing more can be gleaned from this fact. The majority reads a different point into this history: That we do not know how Congress intended § 1981 to apply in Hawaii. This is nonsensical and flies in the face of, among other things, § 1981 itself, the Hawaiian Statehood Act, the equal footing doctrine, and the Supremacy Clause.

Hawaii and its citizens have been subject to § 1981 since Hawaii became a territory because § 1981 applies to "[a]ll persons with the jurisdiction of the United States," including "every State and Territory." 42 U.S.C. § 1981(a) (2000). Congress reaffirmed this when Hawaii became a state in 1959 and joined the Union with all of the privileges and duties of all of the other states, that is, on an "equal footing," as if it had joined the Union at its founding. See *Alaska v. United States*, 545 U.S. 75, ___, 125 S. Ct. 2137, 2143 (2005); *United States v. Texas*, 339 U.S. 707, 716-20 (1950). As a new state, Hawaii and its citizens became subject to all laws of the United States, including § 1981. See U.S. Const. art. VI, cl. 2 ("The Constitution, and the Laws of the United States which shall

be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby . . ."). This was made express in the Hawaiian Statehood Act, which provided that "the laws of the United States shall have the same force and effect within [Hawaii] as elsewhere within the United States." Pub. L. No. 86-3, § 15, 73 Stat. 11 (1959). See also *Calkin v. Cocke*, 55 U.S. 227, 235-36 (1852); *Benner v. Porter*, 50 U.S. 235, 243 (1850). In other words, § 1981 has long applied in Hawaii and on exactly the same terms as it applies elsewhere within the United States.

Second, building from its first faulty premise, the majority insists that § 1981 was "reenacted" in 1991. See Maj. Op. at 19085 ("The 1991 amendments are . . . the only[] time since Hawaii became a state that Congress has *reenacted* § 1981." (emphasis added); *id.* at 19085 ("Congress . . . reenacted § 1981 in 1991."); *id.* at 19086-87 (". . . the pre-1991 statutory landscape . . . informs us about what Congress had in mind when it reenacted § 1981"); *id.* at 19088 (". . . Congress reenacted § 1981 in 1991."); *see also* Conc. Op. at 19096 ("In 1991, Congress revised and reenacted § 1981 . . . ."); *id.* at 19098 ("When Congress reenacted § 1981 . . ."). It wasn't. Rather, § 1981 was *amended* in 1991 by *adding* two provisions; not one word of § 1981's original text was touched by those amendments. Indeed, every word that Congress wrote in 1870 and that was codified in 1874—and was there in 1898 when Hawaii was annexed and in 1959 when Hawaii became a state—is still there.

In 1991, Congress amended § 1981 in two respects: It codified the Court's holding in *Runyon* that § 1981 applies to discrimination by private actors, *see* 42 U.S.C. § 1981(c), and it statutorily overruled the Court's holding in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), that § 1981 does not extend to post-contract-formation conduct, such as the imposition of discriminatory working conditions, *see* 42 U.S.C. § 1981(b).[13] *See also Jones v. R.R. Donnelley & Sons*

---

[13] Section 1981, as amended, now reads in its entirety:

(a) Statement of equal rights

Co., 541 U.S. 369, 373 (2004) ("In 1991, . . . Congress responded to Patterson by adding a new subsection to § 1981 that defines the term 'make and enforce contracts' to include the 'termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.' "); H.R. REP. NO. 102-40, 102d Cong., 1st Sess., pt. II, at 37 (1991) ("[Subsection (b)] overrules Patterson by adding a new subsection to Section 1981 . . . . [Subsection (c)] is intended to codify Runyon v. McCrary."). The majority does not argue that either of those amendments exempted Native Hawaiians, and the 1991 Amendments did not alter subsection (a) (except to add the "(a)" and the heading), which continues to state that the protections of § 1981 apply to "[a]ll persons within the jurisdiction of the United States." There is absolutely no indication in the 1991 amendments or their legislative history that Congress intended to exempt racial preferences for Native Hawaiians from § 1981's broad coverage.[14]

---

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

[14] Judge Fletcher argues that the 1991 amendments were critical because "[i]t was not until the 1991 amendments to § 1981 that Congress specified that it intend[ed] courts to apply the statute to substantive discrimination

Third, the majority points to a variety of other statutes that Congress passed before and after 1991 which favor Native Hawaiians. See Maj. Op. at 19086-88; see also Conc. Op. at 19096-98. It is beyond dispute that Congress has enacted numerous statutes providing separate benefit programs for Native Hawaiians, but nothing in those acts says anything about § 1981, much less exempts Native Hawaiians from its coverage. See, e.g., Hawaiian Homes Commission Act § 1 et seq., 42 Stat. 108 (1920) (setting aside approximately 200,000 acres and establishing a program of loans and long-term leases for the benefit of Native Hawaiians); Department of Defense Appropriations Act, Pub. L. No. 103-335, 108 Stat. 2599, 2652 (1994) ("In entering into contracts with private entities to carry out environmental restoration and remediation of Kaho'olawe Island . . . the Secretary of the Navy shall . . . give especial preference to businesses owned by Native Hawaiians . . . ."); Native Hawaiian Education Act, 20 U.S.C. § 7512(3) et seq. (2002) (establishing programs to facilitate the education of Native Hawaiians and asserting a "political relationship between the United States and the Native Hawaiian people"); Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 et seq. (2002) (extending protection to American Indian and Native Hawaiian burial sites); Native Hawaiian Health Care Improvement Act of 1992, 42 U.S.C. § 11701(17) et seq. (1992) (creating a num-

---

by private actors." Conc. Op. at 19098. It is true that Congress made clear in what is now 42 U.S.C. § 1981(c) that § 1981(a) applies to private entities. But in enacting that provision, Congress merely codified the Court's holding in Runyon that § 1981 reached private conduct under the Thirteenth Amendment. See Runyon, 427 U.S. at 168 n.8; see also Jones v. Alfred H. Mayer Co., 392 U.S. 409, 423-24, 437, 440 (1968) (so holding with respect to 42 U.S.C. § 1982). We never questioned, post-Runyon and pre-1991, that § 1981 reached private conduct. See, e.g., Evans v. McKeel, 869 F.2d 1341, 1344 (9th Cir. 1989) ("Section 1981 prohibits private racial discrimination against white persons as well as against nonwhites." (emphasis added)); Bonilla v. Oakland Scavenger Co., 697 F.2d 1297, 1299 n.4 (9th Cir. 1982) ("[I]t is clear that Section 1981 extends to private conduct as well as state action . . . .").

ber of programs aimed at improving health care for Native Hawaiians and stating: "[t]he authority of the Congress under the United States Constitution to legislate in matters affecting the aboriginal or indigenous peoples of the United States includes the authority to legislate in matters affecting the native peoples of Alaska and Hawai'i"; Hawaiian Homelands Homeownership Act of 2000, Pub. L. No. 106-569, §§ 511-514, 114 Stat. 2944, 2966-67, 2990 (2000) (providing governmental loan guarantees "to Native Hawaiian families who otherwise could not acquire housing financing"); National Historic Preservation Act, 16 U.S.C. § 470-1(2) (1992) (stating that its purpose was to "provide leadership in the preservation of the prehistoric and historic resources of the United States and of the international community of nations and in the administration of the national preservation program in partnership with States, Indian tribes, Native Hawaiians, and local governments"); National Museum of the American Indian Act, 20 U.S.C. § 80q-8 (1989) (providing for the return of Native Hawaiian human remains and funerary objects as well as the creation of a museum exclusively for the preservation and study of the history and artifacts of Native Americans); Drug Abuse Prevention, Treatment and Rehabilitation Act, 21 U.S.C. § 1177(d) (1983) (involving grant applications aimed at combating drug abuse and providing: "The Secretary shall encourage the submission of and give special consideration to applications under this section to programs and projects aimed at underserved populations such as racial and ethnic minorities, Native Americans (including Native Hawaiians and Native American Pacific Islanders), youth, the elderly, women, handicapped individuals, and families of drug abusers."); Native American Languages Act, 25 U.S.C. §§ 2901-06 (1990) (including Native Hawaiian languages in the ambit of Native American languages accorded statutory protection); Workforce Investment Act of 1998, 29 U.S.C. § 2911(a) (1998) ("The purpose of this section is to support employment and training activities for Indian, Alaska Native, and Native Hawaiian individuals"); American Indian Reli-

gious Freedom Act, 42 U.S.C. § 1996 (1978) ("[I]t shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites."); Native American Programs Act of 1974, 42 U.S.C. §§ 2991-92, 2991a (1975) (including Native Hawaiians in a variety of Native American financial and cultural benefit programs: "The purpose of this subchapter is to promote the goal of economic and social self-sufficiency to American Indians, Native Hawaiians, other Native American Pacific Islanders (including American Samoan Natives), and Alaska Natives."); Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act, 42 U.S.C. § 4577(c)(4) (1983) (giving preference to grant applications aimed at combating drug abuse: "The Secretary shall encourage the submission of and give special consideration to applications under this section for programs and projects aimed at underserved populations such as racial and ethnic minorities, Native Americans (including Native Hawaiians and Native American Pacific Islanders), youth, the elderly, women, handicapped individuals, public inebriates, and families of alcoholics."); 20 U.S.C. § 4441 (1986) (providing funding for Native Hawaiian and Alaska Native arts and cultural development); Older Americans Act of 1965, 42 U.S.C. § 3001 et seq., 45 C.F.R. § 1328.1 (1988) (establishing a "program . . . to meet the unique needs and circumstances of Older Hawaiian Natives").

The scope of those enactments further underscores the fact that they could not have created a Native Hawaiian exemption from § 1981. Take, for example, the Hawkins-Stafford Amendments which both the majority and the concurrence point to as evidence that Congress approved and exempted Kamehameha's admissions policy. Maj. Op. at 19087-88; Conc. Op. at 19098. Those Amendments direct the Secretary

of Health and Human Services to "make grants to the Kamehameha Schools/Bernice Pauahi Bishop Estate for a demonstration program to provide Higher Education fellowship assistance to Native Hawaiian students." Pub. L. No. 100-297, tit. IV, § 4005(a), 102 Stat. 360 (1988). A directive to give Kamehameha a grant for a demonstration program does not create an exemption from generally applicable civil rights laws.[15] Furthermore, nothing in Stafford-Hawkins would be inconsistent with enforcement of § 1981 in this case. In fact, it could not be since Congress repealed the demonstration grant program before the sunset provision took effect. Pub. L. No. 103-382, tit. III, § 363, 108 Stat. 3975 (1994), and a current version of the act *only* mentions Kamehameha in the findings of fact. 20 U.S.C. § 7512(16) (2002).

Judge Fletcher goes a step farther than the majority, arguing that the Hawkins-Stafford Amendments and the Public Health Service Act "specifically directed Kamehameha Schools to do precisely what plaintiffs in this case say is forbidden by § 1981." Conc. Op. at 19098. I cannot see how "[making] grants to [Kamehameha] for a demonstration pro-

---

[15] Whether Congress appropriated money to Kamehameha has no bearing on whether it thought that Kamehameha was in compliance with a wholly unrelated statute. It is easy to generate examples which clearly illustrate this: Before 2003, professors at the University of Michigan received numerous federal grants from the National Institutes of Health and the National Science Foundation, but this did not indicate that either Congress or the President believed Michigan's admissions policy was constitutional; indeed, the Department of Justice filed amicus briefs in *Gratz* and *Grutter* arguing just the opposite. Similarly, no one would argue that Congress, by granting federal aid or favorable tax treatment to certain corporations (such as Texaco), intended to grant those corporations exemptions from federal antidiscrimination laws, *cf. Smith v. Texaco, Inc.*, 281 F.3d 477 (5th Cir. 2002). Nor would anyone argue that Congress, by allocating funds to state or local police departments, somehow evinces an intent to exempt such departments from the purview of 42 U.S.C. § 1983. These examples clearly demonstrate both the absurdity and the danger inherent in using such unrelated statutes to draw broad conclusions about Congress's inner mind.

gram to provide Higher Education fellowship assistance to Native Hawaiian students'" or "'provid[ing] funds to [Kamehameha] for the purpose of providing scholarship assistance" to eligible Native Hawaiian students" constitutes a specific instruction from Congress to Kamehameha to apply a racially exclusive admissions policy. *See* Conc. Op. at 19098 (quoting Pub. L. No. 100-297, tit. IV, § 4005(a), 102 Stat. at 360 (formerly codified at 20 U.S.C. § 4905(a)) (repealed 1994) and citing Act of Nov. 29, 1990, Pub. L. No. 101-644, § 401, 104 Stat. 4662, 4668 (codified as amended at 42 U.S.C. §254s)).[16] Judge Fletcher's conclusion is especially baffling because Congress never even mentioned Kamehameha's admissions policy in either piece of legislation, including the legislative history; in fact, there is nothing in the congressional materials to even suggest that Congress *knew* that Kamehameha's admissions policy was racially exclusive, let alone that Congress *endorsed* it.[17]

Additionally, the majority points to a House committee report that "favorably mentioned the Bishop Trust and exhorted the Schools to 'redouble [their] efforts to provide for Native Hawaiians.'" Maj. Op. at 19088 (quoting H.R. Rep. No. 107-634), at 333. A committee report, however, says nothing about how Congress as a whole views Kamehameha's admission policy. This particular report is of no legislative value whatsoever because it does not even accompany an act; in other words, the committee's resolution does not even aspire to be legislative history. Furthermore, a committee's

---

[16] It is also worth noting, once again, that the Hawkins-Stafford Amendments have been repealed.

[17] Judge Fletcher also argues that, "[i]n order to hold for plaintiff in this case, we would have to conclude that, Congress intended [the 1991 amendments to § 1981] to invalidate, *sub silentio*, the recently enacted legislation that provided loans and scholarships exclusively to Native Hawaiians at Kamehameha Schools." Conc. Op. at 19098. Because § 1981, as set out above, has absolutely nothing to do with legislation providing loans and scholarships to Native Hawaiians, that assertion is simply wrong.

mere exhortation that Kamehameha should "redouble [its] efforts to provide for Native Hawaiians..." id., does not, as the majority's reasoning would have it, equal legislation, duly enacted, that "Kamehameha may continue to provide for Native Hawaiians, in violation of existing civil rights laws, if necessary." In fact, there is absolutely no evidence that either house of Congress, or even any subset of its membership, knew about—let alone approved of—Kamehameha's absolute ban on non-Native Hawaiian students. Thus, the Hawkins-Stafford Amendments and the House committee report do not operate as some kind of estoppel against applying generally applicable civil rights laws to Native Hawaiians generally or to Kamehameha in particular.

Finally, from this thin record, the majority concludes that "the most plausible" way to harmonize these acts with the "re-enactment" of § 1981 is to infer that "Congress intended that a preference for Native Hawaiians, in Hawaii, by a Native Hawaiian organization, located on the Hawaiian monarchy's ancestral lands, be upheld." Maj. Op. at 19089. Mere recitation of the conclusion should remind us of Justice Jackson's "restricted railroad ticket, good for this day and train only." *Smith v. Albright*, 321 U.S. 649, 669 (1944) (Jackson, J., dissenting). In any event, there is no need to harmonize these statutes because there is no inconsistency. A straightforward reading of § 1981 does not render any other legislation nonsensical, void, or superfluous. The fact that Congress has passed some measures promoting Native Hawaiian education says nothing about whether Congress intended to exempt Native Hawaiian schools from § 1981; there is no legislative conflict to reconcile.[18] See *Morton v. Mancari*, 417 U.S. 535,

[18]The majority's reliance on *Runyon* in this instance is misplaced. *See* Maj. Op. at 19085 ("In *Runyon*, for instance, the Court relied on Congress' enactment of the Civil Rights Act of 1964 and other civil rights legislation in concluding that Congress must have intended § 1981 to reach private acts of discrimination."). *Runyon* discussed the passage of the Equal Employment Opportunity Act of 1972 because, while considering that act,

551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

Unfortunately, the majority's reasoning reaches far beyond Kamehameha, and in finding that Native Hawaiians preferences are exempt from § 1981, the majority holds that by amending that statute in 1991, Congress narrowed the scope of one of our oldest and most enduring civil rights statutes. *See* Maj. Op. at 19085-87 (using the enactments outlined above to "interpret[] the scope of § 1981"). Moreover, the majority's focus on what Congress may have been *thinking* ignores what Congress actually *did*: It passed § 1981, a non-discrimination law of general applicability. Section 1981, on its face, clearly does not create any exemptions for Native Hawaiians; thus, whether or not Congress *meant* to create such an exemption—and again, there is absolutely no indication that it intended to do so—it certainly did not *create* such an exception. *Cf. Williams v. Babbitt*, 115 F.3d 657, 660 (9th Cir. 1997) ("Congress may well have thought that by passing the [Reindeer Industry] Act, it was effectively precluding anyone other than natives from entering the reindeer business. Nevertheless, nothing in the Act actually prohibits non-natives from entering the Reindeer business . . . .").

To my mind, the disparate statutes favoring Native Hawaiians that the majority relies on demonstrate a different point

Congress specifically considered repealing § 1981 to the extent that it applied to racial discrimination by private employers. *See* 427 U.S. at 173-75. The *Runyon* Court was considering whether § 1981 applied to private acts of racial discrimination, and that debate provided clear evidence that Congress believed that § 1981 applied to contracts between private parties. *Runyon* provides no support for inferring an exception for Native Hawaiians in § 1981 merely because Congress has "provide[d] specifically for their welfare in a number of different contexts." Maj. Op. at 19086.

altogether: That when Congress wishes to give Native Hawaiians special treatment, it knows how to do so—and it is not shy about it. *Cf. Malabed v. N. Slope Borough*, 335 F.3d 864, 872 (9th Cir. 2003) ("The existence of express preference programs created by Congress supports our conclusion . . . . [T]hey show that when Congress wants to authorize or require Native [American] hiring preferences, it knows how to do so."); *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 154 F.3d 1117, 1123 (9th Cir. 1998) ("The fact that Congress now requires a narrowly defined set of contracts to honor local tribal preference policies not only fails to support the argument that it intended to accomplish that same objective in 1964 when passing Title VII, but it suggests quite the opposite proposition. It shows us that when Congress wishes to allow tribal preferences, it adopts an appropriate amendment to the applicable statute."); *Williams*, 115 F.3d at 661 ("[T]he total and perpetual exclusion of a majority of the population . . . from a particular enterprise is the kind of significant feature we would normally expect Congress to spell out if that were its intent."). Nothing in the statutory language or legislative history of § 1981 even hints that Congress wanted to exempt Native Hawaiian preferences from its provisions. Finding an exemption here is beyond any accepted method of statutory interpretation.[19]

[19] The majority's new statutory metaphysics raises far more questions than it answers: How many provisions favoring Native Hawaiians must Congress pass before we will imply an exemption to § 1981? Would one act favoring Native Hawaiians somehow establish a lower level of scrutiny for Native Hawaiian preferences, and a subsequent act completely exempt such preferences—or was the exemption granted in one fell swoop? How might Congress go about removing this exemption: how many acts have to be repealed in order to repeal this exemption? If Congress had wanted Native Hawaiians to be covered by § 1981, must it have expressly *included* them? Who else is exempted from § 1981 under the majority's logic?

There is no end to this game.

If Congress wishes to exempt preferences for Native Hawaiians from § 1981, it may do so. Until then, however, we ought to apply the law as written. And as written, § 1981 clearly encompasses Kamehameha's racially exclusive admissions policy.

### III.  NATIVE HAWAIIANS, *MANCARI*, AND THE SPECIAL RELATIONSHIP DOCTRINE

Judge Fletcher raises an interesting variation on the last argument. Like the majority, the concurrence concludes that racial preferences on behalf of Native Hawaiians are exempt from § 1981. However, Judge Fletcher arrives at this result via a slightly different route: First, he reasons that Native Hawaiian status is *both* a political *and* a racial classification. Conc. Op. at 19090 He then suggests that, under the "special relationship" doctrine, Congress has given Native Hawaiians special benefits based on their *political* status. *Id.* at 19090-92. From that, Judge Fletcher then postulates that because Congress has given Native Hawaiians special benefits, it could not have intended to prohibit private parties from doing the exact same thing. *Id.* at 19094. Thus, according to the concurrence, § 1981, which prohibits *racial* preferences in private contracts, must be read to exempt preferences on behalf of Native Hawaiians. *Id.* at 19102.

To establish his beginning premises, Judge Fletcher must rely on *Morton v. Mancari*, 417 U.S. 535 (1974), which created the "special relationship" doctrine. In *Mancari*, the Supreme Court held that the Bureau of Indian Affairs's ("BIA") hiring preference for Native Americans did not constitute racial discrimination. 417 U.S. at 553-54. Instead, the Court wrote that the preference was "not directed towards a 'racial' group consisting of 'Indians'; instead, it applies only to members of 'federally recognized' tribes." *Id.* at 553 n.24. The Court concluded that this preference was therefore not a *racial* preference at all, but instead a *political* preference, and applied rational basis scrutiny. *Id.* Judge Fletcher would con-

clude that, under *Mancari*, Congress has the power to exempt private parties' racial preferences in favor of Native Hawaiians from the purview of § 1981. Conc. Op. at 19095.

Before discussing the merits of the concurrence's reasoning, I note that Kamehameha did not make this argument on appeal, and it was not briefed by either party. Kamehameha did argue, as the majority concludes, that preferences in favor of Native Hawaiians are exempt from § 1981; however, it did not base its argument on the special trust doctrine espoused in *Mancari*. In fact, Kamehameha's brief does not even cite *Mancari*.[20] Because arguments not made in a party's appellate brief are waived, *see Blanford v. Sacramento County*, 406 F.3d 1110, 1114 n.8 (9th Cir. 2005); *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003), it is improper for the court to even consider the argument raised by Judge Fletcher.

Nonetheless, turning to the merits, Judge Fletcher's argument puts more weight on *Mancari* than it can bear. As I explain in greater detail below, the exception in *Mancari* is an exceedingly narrow one, limited to preferences that are political not racial. Second, *Mancari*'s special relationship works only in those cases where Congress has formally recognized the sovereignty of Native American tribes. Despite opportunity to do so, Congress has never formally recognized the sovereignty of Native Hawaiians. Third, even if Congress had recognized Native Hawaiians as a sovereign body, the special relationship doctrine applies only to preferences by the federal government or by the tribes themselves. It does not apply to private parties discriminating on the basis of tribal status; indeed, we have been quite clear that such private racial discrimination remains illegal.

---

[20] In light of the narrowness of the *Mancari* exception, which I discuss below, it is easy to see why Kamehameha decided that it was better off using its scarce brief space and oral argument time to pursue other arguments.

First, Judge Fletcher agrees with the majority that "'Native Hawaiians' . . . is a racial classification." Conc. Op. at 19090; *see* Maj. Op. at 19067 n.9. But Judge Fletcher goes one step further, suggesting that "'Native Hawaiians' is not merely a racial classification," but "also a political classification." *Id.* at 19091. If Judge Fletcher is correct, this case, from the outset, does not come within the special relationship doctrine of *Morton v. Mancari* because *Mancari* denied the very premise from which the concurring opinion proceeds. For instance, *Mancari* held that the BIA's Native American hiring preference "does not constitute 'racial discrimination.'" 417 U.S. at 553. "Indeed, it is not even a 'racial' preference." *Id.* As the Court explained:

> The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion. In the sense that there is no other group of people favored in this manner, the legal status of the BIA is truly *sui generis*.

417 U.S. at 554 (citation omitted). Moreover, in concluding that the preference was political and not racial, the Court relied on the fact that the beneficiaries were members of federally recognized tribes:

> The preference is not directed towards a 'racial' group consisting of 'Indians'; instead, it applies only to members of 'federally recognized tribes.' This operates to exclude many individuals who are racially to be classified as 'Indians.' In this sense, the preference is political rather than racial in nature.

*Id.* at 553 n.24 (internal quotation marks omitted). As the Supreme Court explained in *Rice v. Cayetano*, "[a]lthough the classification [in *Mancari*] had a racial component, the Court found it important that the preference was not directed

towards a racial group consisting of Indians, but rather only to members of federally recognized tribes. In this sense, the Court held, the preference was political rather than racial in nature." 528 U.S. 499, 519–20 (2000) (citation and internal quotation marks omitted).

Here, Judge Fletcher agrees that, whatever else Kamehameha's admissions policy may be, it is a racial classification. This fact places Kamehameha's policy outside the scope of *Mancari*'s holding. The distinction is critical, because if a preference for Native Hawaiians were *only* political and *not* racial, then § 1981, by its own terms, would not apply. No exemption from § 1981 would be necessary. *See Sugana v. Tenorio*, 384 F.3d 731, 738 (9th Cir. 2004) ("[T]he guarantee that 'all persons' may enjoy the same rights that 'white citizens' enjoy does not protect against discrimination on the basis of . . . political affiliation."); *Keating v. Carey*, 706 F.2d 377, 384 (2d Cir. 1983) ("In light of the Court's interpretation, the legislative history, and the express language of the statute, we hold that § 1981, however generously construed, does not prohibit discrimination on the basis of political affiliation.").

Further, *Mancari* was premised on actual federal recognition of Native American tribes. *See, e.g.*, 417 U.S. at 542 (emphasizing the BIA's control over the "lives and destinies of the *federally recognized Indian tribes*") (emphasis added); *id.* at 551 ("Resolution of the instant issue turns on the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of *federally recognized Indian tribes*.") (emphasis added); *id.* at 553 n.24 ("The preference is not directed towards a 'racial' group consisting of 'Indians'; instead, it applies only to members of '*federally recognized tribes*.'") (emphasis added); *see also Rice*, 528 U.S. at 519-20.

Native Hawaiians have never been accorded formal recognition as a Native American tribe,[21] and while the "special trust relationship" between Congress and Native Hawaiians bears many similarities to the relationship between Congress and Native American tribes, the two relationships are not identical. And, as we recently acknowledged, "absent federal recognition, tribes do not enjoy the same status, rights, and privileges accorded federally recognized tribes." *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 n.1 (9th Cir. 2004). In fact, Congress has passed many statutes benefitting Native American tribes that do not include Native Hawaiians, or which distinguish them from Native American tribes. *See, e.g.*, Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 et seq. (2000) (defining an "Indian" as "a person who is a member of [a federally recognized] Indian tribe"); 25 U.S.C. § 3001(9), (10) (2000) (defining Native American as "of, or relating to, a tribe, people, or culture that is indigenous to the United States" and Native Hawaiian, by contrast, as "any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii."); *see also Kahawaiolaa*, 386 F.3d at 1282 ("[F]ederal benefits and entitlements for native Hawaiians [are] different from [those] afforded federally recognized Indian tribes . . ."); *id.* ("Congress, because of the unique history of Hawaii, has excluded [Native Hawaiians] from some statutes . . ."); *id.* ("[M]any statutes distinguish between native Hawaiians and members of Indian tribes.").

[21]There is currently legislation in Congress—part of an ongoing effort—to extend formal recognition to Native Hawaiians. *See* S. 147, 109th Cong. (2005); H.R. 309, 109th Cong. (2005). Neither house has taken any action to date. Even if it were passed, however, there is cause to question whether such an act would be within Congress's constitutional power. *See Rice*, 528 U.S. at 519 ("It is a matter of some dispute . . . whether Congress may treat the native Hawaiians as it does the Indian tribes."). I decline to decide this question here; thus, I will prospectively assume that Congress has the power to formally recognize Native Hawaiians and to treat them as any other federally recognized tribe.

We cannot usurp Congress's power to grant or not grant formal recognition to Native Hawaiians by simply declaring that the "comparable" status of Native Hawaiians, 20 U.S.C. § 7512(12)(D), gives them tribal status. Congress has created a discrete process for recognizing Indian tribes as tribes. *See* Indian Reorganization Act, 25 U.S.C. § 461 *et seq.*; *see also* 25 C.F.R. § 83.1 *et seq.* (1994) (Department of Interior regulations). Formal recognition as a tribe comes with a bundle of privileges, including self-government, tribal courts, control of Indian lands, and the power to tax. *See, e.g., Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130 (1982); *Montana v. United States,* 450 U.S. 544 (1981); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49 (1978). None of these privileges have yet been afforded to Native Hawaiians, a judgment we recently upheld in *Kahawaiolaa v. Norton.* As we concluded there, "in the end, we must commit this question to Congress to apply its wisdom in deciding whether or not native Hawaiians should be included among those eligible to apply for federal tribal recognition." 386 F.3d at 1283.[22]

[22]Judge Fletcher's concurrence cites two cases decided after *Mancari* which, he argues, eliminated the requirement for federal recognition: *United States v. John,* 437 U.S. 634 (1978), and *Delaware Tribal Business Committee v. Weeks,* 430 U.S. 73 (1977). *See* Conc. Op. at 19092-93. I disagree with the characterization of these cases. The first case, *John,* for example, did not even involve a *Mancari* issue but concerned whether certain lands constituted "Indian country" for purpose of the Major Crimes Act. *See* 18 U.S.C. § 1151; *see also John,* 437 U.S. at 635, 647-50. Moreover, because the tribe involved in *John* had been accorded federal recognition, reliance on that case to demonstrate that federal recognition is not necessary for the *Mancari* doctrine to apply is inapposite. *Id.* at 650. Similarly, Judge Fletcher's reliance on *Weeks* is misplaced. In *Weeks,* the Supreme Court rejected an Equal Protection Clause challenge to Congress's decision not to include the descendants of members of a recognized tribe who had voluntarily renounced their status in exchange for United States citizenship from a compensation scheme that benefitted the descendants of tribal members who had renounced their tribal status. The opinion cites *Mancari,* but not for reasons important to the holding of either case. *See* 430 U.S. at 84, 85. Neither *John* nor *Weeks* modified *Mancari*'s holding, either explicitly or implicitly.

Finally, even if Congress had formally recognized Native Hawaiians, *Mancari*'s special status doctrine would still not benefit Kamehameha because that doctrine does not apply to private parties. *Mancari* approved a Native American hiring preference adopted by the BIA because of the tribes' capacity as "quasi-sovereign[s]." *Mancari,* 417 U.S. at 554; *see also Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 14 (1987); *Fisher v. Dist. Ct.,* 424 U.S. 382, 390-91 (1976). The "special relationship" recognized in *Mancari* was a sovereign-to-sovereign relationship that Congress has the power to regulate by virtue of the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and the Treaty Clause, *id.* art. II, § 2, cl. 2, which "has often been the source of the Government's power to deal with the Indian tribes." *Mancari,* 417 U.S. at 552; *see also United States v. Lara,* 541 U.S. 193, 200 (2004). Thus, private parties may not seek refuge in *Mancari*'s special relationship doctrine. Kamehameha—despite the strong loyalty of Native Hawaiians—is a private school established by a private trust, and not a recognized means of Native Hawaiian self-government.

Judge Fletcher's concurrence misses this point entirely when it asserts that "Congress may, if it wishes, permit Kamehameha Schools to give preferential admission treatment to Native Hawaiians." Conc. Op. at 19095.[23] Judge Fletcher does

[23]Judge Fletcher has it backwards. He cites the same body of laws—the collection of different preferences for Native Hawaiians—as evidence that Congress both impliedly created a special relationship with Native Hawaiians *and* impliedly exempted them from § 1981. But Judge Fletcher's analogy to Native Americans is flawed: Congress has *expressly* created a special relationship with Native Americans by formally recognizing the tribes.

This makes a difference. The Tenth and Eleventh Circuits have held that Native American tribal entities *are* impliedly exempt from some suits under § 1981. But those courts reasoned that because tribes are expressly exempted from disparate impact suits under Title VII. *See* 42 U.S.C. § 2000e(b); *id.* § 2000e-2, plaintiffs may not circumvent Title VII's exemption by suing under § 1981. *See Taylor v. Alabama Intertribal*

not cite a single case where a court has upheld a private preference for Native American tribal members under the special relationship doctrine. In fact, we have soundly rejected exactly that argument. In *Dawavendewa v. Salt River Project Agricultural Improvement and Power District*, 154 F.3d 1117 (9th Cir. 1998), pursuant to an agreement with the Navajo Tribe, an Arizona corporation sought to discriminate in employment by favoring members of the Navajo Tribe. Dawavendewa, a member of the Hopi Tribe, filed a Title VII claim alleging national origin discrimination. The defendants argued that, based on *Mancari*, "preferences based on tribal affiliation are based on *political affiliation* rather than national origin and are thus outside the realm of Title VII." *Id.* at 1120. Citing "the unique interest the [BIA] had in employing Native Americans," that had led the Court to recognize a limited exception for Congress, we held that the plaintiff had alleged a violation of Title VII. *Id.* at 1120.

We have even rejected attempts to extend *Mancari's* exception to other *governmental* entities. In *Malabed v. North Slope Borough*, 335 F.3d 864 (9th Cir. 2003), a local government adopted an ordinance that gave an employment preference to Native Americans, defined as members of federally recognized Indian tribes. Plaintiffs challenged the ordinance under the equal protection guarantee of the Alaska Constitution. The Borough attempted to justify its ordinance by relying on *Mancari*. Citing *Rice*, we limited *Mancari's* political exception to Congress's dealings with federally recognized Native American tribes and invalidated the ordinance. *See id.* at 865 n.5 ("*Mancari* held only that when *Congress* acts to fulfill its unique trust responsibilities toward Indian tribes, such legisla-

*Council Title IV J.T.P.A.*, 261 F.3d 1032, 1034-35 (11th Cir. 2001); *Wardle v. The Indian Tribe*, 623 F.2d 670, 672 (10th Cir. 1980). Unlike the tribes, Native Hawaiians are not expressly exempted from Title VII, although there may be reason to wonder whether the majority's opinion implicitly exempts them.

tion is not based on a suspect classification." (emphasis added). Other courts have taken a similar approach. *See, e.g., Tijova v. City of Albuquerque*, 751 F. Supp. 1527, 1530 (D.N.M. 1990) ("As the Supreme Court so clearly stated in *Morton*, Congress' obligations to Indians are constitutionally based and unique. The City of Albuquerque does not have comparable power to treat members of federally recognized Indian tribes or pueblos or members of the Navajo Nation differently than other groups of Indians or non-Indians."); *id.* at 1531 ("The Albuquerque City Council has considerably less power than the United States Congress to pass law discriminating in favor of members of federally recognized Indian tribes and pueblos. In this respect, the rationale in *Morton* is inapplicable to this case."); *see also Rice*, 528 U.S. at 520, 522 (refusing to extend *Mancari* to state elections privileging Native Hawaiians: "the elections for OHA trustee are elections of the State, not a separate quasi sovereign").

*Mancari* may not even extend to Native American preferences in hiring by other federal agencies. The Court's holding in *Mancari* relied on the fact that "the preference applies only to employment in the Indian service," an agency that the Court described as "sui generis," 417 U.S. at 554. The Court specifically did not "consider the obviously more difficult question that would be presented by a blanket exemption for Indians from all civil service examinations." *Id.; see also Rice*, 528 U.S. at 520 (noting "that [*Mancari*] was confined to the authority of the BIA, an agency described as 'sui generis'"); *Dawavendewa*, 154 F.3d at 1120 (similar). We have previously limited the scope of *Mancari* in this fashion. In *Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997), for example, we considered whether the Reindeer Industry Act limited ownership of reindeer to Native Alaskans and whether such a limitation would be constitutional. The Act's defenders attempted to justify it under the Court's holding in *Mancari*. We rejected this argument, holding that the power granted Congress under *Mancari's* exception was of a far narrower scope. *See id.* at 664 ("The preference at issue in *Mancari*"

only applied to the BIA, an agency created for the purpose of serving Indians."); *id.* at 664-65 ("[W]e can discern *Mancari*'s scope by looking to the cases it cited as examples of permissible special treatment for Indians. Each case dealt with life in the immediate vicinity of Indian land." (citations omitted)); *id.* at 655 ("While *Mancari* is not necessarily limited to statutes that give special treatment to Indians on Indian land, we do read it as shielding only those statutes that affect uniquely Indian interests."); *id.* ("[W]e seriously doubt that Congress could give Indians a complete monopoly on the casino industry or on Space Shuttle contracts.").

In sum, *Mancari* does not support Judge Fletcher's claim that Kamehameha's admissions policy is justified because it is both a racial and political classification. Judge Fletcher's rationale would render *Mancari* unrecognizable. Indeed, as with the exclusive Native Hawaiian voting scheme rejected by the Supreme Court in *Rice*, if Kamehameha's racially exclusive admissions policy "were to be sustained under *Mancari* we would be required to accept some beginning premises not yet established in our case law. . . . These propositions would raise questions of considerable moment and difficulty." 528 U.S. at 518.

## IV.  CONCLUSION

As noble as Kamehameha's goals may be, I cannot reconcile its admissions preference—a racially exclusive policy that operates as a complete bar to all applicants who are not of the preferred race—with the Supreme Court's requirements for a valid affirmative action plan. I cannot reconcile Kamehameha's admissions policy with the plain commands of § 1981, nor can I find any evidence whatsoever that Congress exempted Kamehameha from § 1981 altogether. The majority exempts an organization with noble goals that seeks to remedy a significant problem in a community that is in great need, but it can do so only because the majority departs from clear principles and established precedent.

I respectfully dissent.

RYMER, Circuit Judge, with whom KOZINSKI, O'SCANNLAIN, TALLMAN and CALLAHAN, Circuit Judges, join, dissenting:

This is altogether infelicitous.

On the one hand, the Kamehameha Schools is a well-recognized, widely- acclaimed private school, established before Hawaii became a state, whose primary mission has been to educate Native Hawaiian students in a culturally sensitive, challenging way. It receives no federal funds and does not operate for profit. Its purpose of providing meaningful access to educational opportunity is intuitively salutary. On the other hand, the admissions policy of the Kamehameha Schools prefers students of Native Hawaiian ancestry in such a way that, as a practical matter, non-Native Hawaiian students are precluded.

The question is whether Kamehameha's admissions policy violates 42 U.S.C. § 1981. Section 1981 was originally enacted as part of the 1866 Civil Rights Act, and confers on "[a]ll persons . . . the same right in every State . . . to make and enforce contracts as is enjoyed by white citizens . . . ."

We do not write on a clean slate, otherwise I would question how a statute that accords to all persons the same right to contract as is enjoyed by *white citizens* can mean the same right to contract as is enjoyed by *Native Hawaiians*. Yet it was held long ago that § 1981 applies to persons of any race. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976), and more recently, that Native Hawaiian ancestry can be a proxy for race, *Rice v. Cayetano*, 528 U.S. 495, 514 (2000).[1]

---

[1] *See also Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) (holding that § 1981 protects against discrimination based on ancestry).

Likewise, I would have difficulty understanding how § 1981 applies to a purely private, philanthropically-endowed, non-profit educational institution. However, it was also held long ago that § 1981 applies to private transactions, *Tillman v. Wheaton-Haven Recreation Assn.*, 410 U.S. 431, 440 (1973), including to contracts for educational services,[2] *Runyon v. McCrary*, 427 U.S. 160 (1976),[3] *But see Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 449-76 (1968) (Harlan, J., dissenting from application of the similarly-worded 42 U.S.C. § 1982 to private discrimination in the sale or rental of property); *Runyon*, 427 U.S. at 192-214 (White, J., dissenting). Finally, because education is the greatest inheritance of all, I have difficulty understanding what business it is of the federal government to tell a Native Hawaiian that she can't choose to help other Native Hawaiians whom she believes particularly need it.

This said, I am not persuaded that precedent allows the Kamehameha Schools to justify its preferential admissions policy on the footing that the policy redresses past societal discrimination against Native Hawaiians. The majority and dissenting opinions agree that we are guided by Title VII standards.[4] I agree with Judge Bybee that when, as here, a volun-

---

[2] Neither party discusses whether the right to "contract" is implicated by the kind of subsidized educational opportunity offered by the Kamehameha Schools. *Cf. Runyon*, 427 U.S. at 172 (noting that the private, commercially operated schools being sued there for excluding qualified children solely because they were black would have received payments for services rendered, and the prospective students would have received instruction in return for those payments).

[3] The Court noted both points — that § 1981 applies to any race and to a contract for educational services — in *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) (citing *McDonald* and *Runyon* with apparent approval).

[4] *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186-87 (1989) (embracing Title VII framework in § 1981 case). *But see Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (observing that "the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause), *and Gratz*, 539 U.S. at 276 n.23 (noting that "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981").

tary, private, affirmative action plan is at issue, the test is whether it eliminates a manifest racial imbalance, does not unnecessarily trammel the rights of non-preferred groups or create an absolute bar to their advancement, and makes adjustments that do no more than necessary to obtain a racial balance. *United Steelworkers of America v. Weber*, 443 U.S. 193, 208-09 (1979); *see Rudebusch v. Hughes*, 313 F.3d 506, 521 (9th Cir. 2002) (breaking the *Weber* standard into these three factors).

Obviously, the Kamehameha Schools itself has never discriminated against Native Hawaiians; it is dedicated to serving them. Thus, the articulated justification for its race-based admissions policy is to remedy *external* discrimination, not *internal* imbalance. Even if a private educational enterprise has more wiggle room in defining its core mission in a race-conscious way than a private employer, to legitimate a race-based policy solely on account of discrimination *by others* is to put no bounds on it at all. To do so would render meaningless the factors that influenced the Supreme Court in *Weber* to approve a voluntary, private, affirmative action plan. 443 U.S. at 208-09. A private entity's progress toward achieving "balance" cannot realistically be assessed if measured against society as a whole rather than its own work force or its own student body. But, even if a private party should be able to assume a public responsibility for remediation of past societal discrimination, the acceptable goal of a race-conscious admissions policy for a public educational institution is to achieve a diverse student body. *Grutter*, 539 U.S. at 325 (endorsing the view that student body diversity is a compelling state interest that can justify the use of race in public university admissions). The purpose of Kamehameha Schools and its admissions policy is, of course, just the opposite. That, in a nutshell, is why I feel bound to reverse.

Beyond this, I agree with Judge Bybee that Congressional applause for programs that benefit Native Hawaiians neither connotes approval of an exclusionary admissions policy based

on racial preference, nor grafts an exception onto § 1981. I also agree that *Morton v. Mancari*, 417 U.S. 535 (1974), does not save the Kamehameha policy. *Mancari* involved a federal employment preference for persons of tribal ancestry that the Court upheld against a Fifth Amendment challenge because tribes, which are federally-recognized, are a political, rather than a racial, classification. 417 U.S. at 553-55. However, the Court has since declined to extend *Mancari* to an Hawaii statutory scheme that restricted voting for certain state officials to those of Native Hawaiian ancestry. *Rice*, 528 U.S. at 518-23.

As no other basis appears for affirming, I would reverse.

KLEINFELD, Circuit Judge, with whom Judges KOZINSKI and O'SCANNLAIN, Circuit Judges, join, dissenting:

I agree in large part with Judge Bybee's dissent and join in Parts II and III. His analysis of the majority and concurring opinions is in my view correct.

I write separately because I do not agree with Judge Bybee's view that Title VII provides the standard of review in this case. Title VII prohibits discrimination in employment.[1] This case does not involve employment. Title VII has nothing

to do with exclusion of students from schools because of race. Nor is there a need to mine Title VII for some sort of analogy.[2]

The recent U.S. Supreme Court decisions about affirmative action, *Grutter*[3] and *Gratz*,[4] also have nothing to do with this case. Those cases involved whether racial discrimination by public schools under affirmative action plans violated the Equal Protection Clause of the Fourteenth Amendment. This case does not involve a public school or state action, so *Grutter*, *Gratz*, and the Equal Protection Clause do not come into the analysis.

We are not free to treat Hawaiian ancestry as a political rather than racial designation under *Morton v. Mancari*[5] because the Supreme Court held in *Rice v. Cayetano* that Hawaiian ancestry is a "racial classification."[6] If Congress chooses to define persons of Native Hawaiian ancestry as Indians under 25 U.S.C. § 479 or some other provision, perhaps it can.[7] But it has not.

This case is considerably simpler. In practice. Kamehameha Schools excludes students who do not have Native Hawaiian ancestry. The Kamehameha Schools are admirable in many ways, and there are good historical and social reasons why reasonable people might want to follow just such a policy. But we are not free to make a social judgment about what is best for Hawaiians. We are stuck with a case that is before us in our capacity as judges and we have to follow the law.

---

[1] *See* 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.").

[2] *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), speaks to both Title VII and 42 U.S.C. § 1981. Because *Patterson* was an employment case covered in part by each statute, it does not speak to exclusion from a private school by reason of race.

[3] *Grutter v. Bollinger*, 539 U.S. 306 (2003).

[4] *Gratz v. Bollinger*, 539 U.S. 244 (2003).

[5] 417 U.S. 535 (1974).

[6] *Rice v. Cayetano*, 528 U.S. 495, 522 (2000).

[7] *See Rice v. Cayetano*, 528 U.S. 495, 519 (2000).

v. McCrary, 427 U.S. 160, 172-73 (1976), and McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 295-96 (1976), prohibit private racial discrimination in the making and enforcing of contracts. The provision is implicated here because the schools charge tuition and must therefore enter into a contractual relationship with each student. I don't believe section 1981 would apply at all if the schools were run entirely as a philanthropic enterprise and allowed students to attend for free. In Runyon, "the racial exclusion practiced by the [schools] amount[ed] to a classic violation of § 1981," because "[t]he parents . . . sought to enter into contractual relationships with [the schools] for educational services." 427 U.S. at 172. The Court emphasized the commercial nature of the relationship: "Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments." Id. I have found no case where section 1981 has been applied to a charity. Were the schools to forego charging tuition, their relationship to their students would probably not be deemed "contractual" as that term is used in section 1981 and Runyon.

Being able to charge tuition is, of course, not inconsequential. For most private schools it is a make-or-break proposition. But it may not be so for the Kamehameha Schools, which were set up primarily as eleemosynary institutions. The tuition they charge reflects only a small fraction of their operating costs and, even then, most students pay a reduced tuition, or no tuition at all. See maj. op. at 19057-58. The schools' substantial endowment may enable them to continue operating without charging any tuition for a very long time—perhaps indefinitely.

Given the scores of pages we have written on both sides of this issue, it should be clear that the question is close and ours may not be the last word. Given the passions this case has aroused, see maj. op. at 19064 n.6, it's worth noting that what's really at stake may not be the operation of the Kame-

---

The law we have to follow was laid down by the Supreme Court in Runyon v. McCrary,[8] Runyon holds that the Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits a private school from denying admission to prospective students because of their race.[9] It might have been thought that Runyon prohibited discrimination only against black people, but we are not free to interpret it that way. In McDonald v. Santa Fe Trail Transportation, the Supreme Court decided that the statute construed in Runyon, 42 U.S.C. §1981, protects whites as well as non-whites from discrimination.[10] A fortiori it protects all the ethnic groups in Hawaii: blacks, Filipino-Americans, Japanese-Americans, American Samoans, Chinese-Americans, and all the others, regardless of their ancestry.

In my view, that is the end of the analysis. I might have preferred to avoid deciding this case, if some jurisdictional defect existed. But we do have jurisdiction. Employment law, Indian law, our admiration for Kamehameha Schools, and our sentiments about public policy are irrelevant.

I respectfully dissent.

KOZINSKI, Circuit Judge, dissenting:

I join all three of my dissenting colleagues. Judges Rymer, Kleinfeld and Bybee have catalogued eloquently the many reasons why neither the majority nor the concurrence reflects what the law is, or should be, and there's nothing I can add on that score.

I write only to point out that the issue we are called on to decide may be a problem of the schools' own making. Runyon

---

[8] 427 U.S. 160 (1976).

[9] Runyon v. McCrary, 427 U.S. 160, 172-73 (1976).

[10] McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 280 (1976).

19160        Doe v. Kamehameha Schools

hameha Schools along their traditional (preferential) model, but merely a few million dollars a year the schools now get from their own students.